**MARTIN MARIETTA CORPORATION,
Petitioner,**

**v.**

**Paul M. LORENZ, Respondent.**

**No. 90SC583.**

Supreme Court of Colorado,
En Banc.

Jan. 13, 1992.

As Modified on Denial of Rehearing
Feb. 3, 1992.

Holme Roberts & Owen, John R. Webb, Katherine J. Peck, Susan B. Prose, Edwin P. Aro, Karen M. Barry, Denver, for petitioner.

Feiger, Collison & Killmer, Gilbert M. Roman, Darold W. Killmer, Denver, for respondent.

Barry D. Roseman, Law Offices of John W. McKendree, Thomas A. Feldman, Denver, for amicus curiae Nat. Employment Lawyers Ass'n.

Justice QUINN delivered the Opinion of the Court.

In *Lorenz v. Martin Marietta Corp., Inc.,* 802 P.2d 1146 (Colo.App.1990), the

court of appeals reversed the trial court's entry of a directed verdict against the plaintiff, Paul M. Lorenz, an at-will employee of Martin Marietta Corporation, on his tort claim against Martin Marietta for wrongful discharge predicated on Lorenz's alleged refusal to perform an illegal act. The court of appeals held that Lorenz's claim was cognizable in tort, that the standard for a wrongful discharge claim established in *Cronk v. Intermountain Rural Elec. Ass'n*, 765 P.2d 619 (Colo.App.1988), should be applied retroactively to Lorenz's claim, and that the statute of limitations for such a claim began to run on the day following Lorenz's discharge rather than on the date on which he was notified of his termination. We affirm the judgment, but in so doing we employ a slightly different analysis than that utilized by the court of appeals. We hold that a claim for wrongful discharge under the public-policy exception to the at-will employment doctrine is cognizable in Colorado and that, in order to withstand a directed verdict on a claim for wrongful discharge based on an employee's refusal to perform an illegal act, the employee must establish, in addition to the elements outlined in *Cronk*, that the employer had actual or constructive knowledge that the employee's refusal to perform the act was based on the employee's reasonable belief that the act directed by the employer was unlawful. In addition, we hold that the public-policy exception to the at-will employment doctrine should be retroactively applied to Lorenz's claim. Finally, we hold that Lorenz's cause of action accrued on the date of his actual discharge and that his tort claim was filed within the applicable statute of limitations. Because the added element applicable to Lorenz's claim for wrongful discharge—namely, the employer's actual or constructive knowledge of the reason for the employee's refusal to perform the act—had not been formulated as the controlling law when this case was tried, we remand the case for a new trial in the interest of fairness to both Lorenz and Martin Marietta.

## I.

Lorenz's claim against Martin Marietta was predicated on the theory of wrongful or retaliatory discharge as the result of his failure to engage in acts of deception and misrepresentation concerning the quality of materials used by Martin Marietta in designing equipment for the National Aeronautics and Space Administration (NASA). The case was tried to a jury commencing on September 15, 1986, and at the conclusion of Lorenz's case the trial court directed a verdict in favor of Martin Marietta. Because of this evidentiary posture of the case, we summarize the evidence in the light most favorable to Lorenz, as we must for purposes of appellate review of a directed verdict. *See Jasko v. F.W. Woolworth Co.*, 177 Colo. 418, 422, 494 P.2d 839, 841 (1972).

Lorenz held an advanced degree in mechanical engineering and, as of the date of the trial, had completed all his work for a doctorate degree in metallurgy except a thesis. Before joining Martin Marietta in 1972, he worked for the Boeing Company in Washington on defense and aerospace projects for sixteen years and specialized in fracture mechanics, which basically involved a study of the fracture or stress resistance of materials used in design and construction of defense and aerospace equipment. In July 1972 he was offered a position with Martin Marietta in Colorado. He accepted the offer and worked for Martin Marietta as an at-will employee until his termination in July 1975.

Lorenz worked in Martin Marietta's research and development department as a "principal investigator" on a number of NASA projects involving the design of equipment for the United States space-shuttle program. As a "principal investigator," Lorenz was responsible for the organization and quality control of the projects assigned to him. In the course of his responsibilities, he expressed concerns to his superiors at Martin Marietta over three major NASA projects referred to as the NDI Contract, the Mixed Mode Contract, and the Tug Irad Contract. These projects were instituted by Martin Marietta in response to NASA's requests for propos-

als relating to equipment to be used in the space-shuttle system.

The purpose of the NDI Contract was to produce data regarding the quality of materials to be used in the design of an external tank for the space shuttle. In the fall of 1973, a design and review meeting was held to evaluate the status of the NDI Contract. During this meeting Lorenz expressed his concern that the testing sequence proposed was inadequate and that the existing data were insufficient to permit the designers to develop a safe external tank within the proposed contract price. Lorenz expressed his concern to his department head that Martin Marietta's proposals to NASA were "high promises" without any means to implement them. Due in part to the high cost of additional testing recommended by Lorenz, his comments were not well received by his supervisors.

In 1974 Lorenz told his supervisors that the data generated under the NDI Contract were not being communicated to the appropriate NASA personnel. When no action was taken on his concerns, he related them to the NASA project manager, who described Lorenz as "very attentive to details" and straightforward in his evaluations and criticisms of a particular project. As a result of Lorenz's action, a technical review session was held in order to address his concerns. Lorenz was chosen to take the minutes of this meeting and to distribute them to Martin Marietta and NASA participants. After drafting the minutes, Lorenz was instructed by a higher Martin Marietta official to make modifications in the minutes. Lorenz refused to make any changes to the minutes, and responded instead with a memorandum stating that the proposed modifications were not mere corrections but rather were retractions of important representations made by Martin Marietta officials to NASA at the review session. Lorenz was informed by his supervisor that he should have made the modifications and was warned that he should "start playing ball with management."

Lorenz later became involved as a principal investigator in another NASA project, referred to as the "Mixed Mode Contract."

This project, which was funded from an internal research and development contribution of $25,000 from NASA, was undertaken by Martin Marietta in response to NASA's request for a contract proposal relating to the design and construction of a testing machine known as the Biaxial Test Fixture. The machine's purpose was to measure complex stresses in aluminum alloys used in the space shuttle. In August 1974 Lorenz wrote a memorandum to his superiors regarding problems which, if not corrected, could result in serious delays and costs. When asked to inspect the Biaxial Test Fixture, Lorenz found it to be deficient and unable to properly perform the function for which it was designed. Upon asking the person responsible for constructing the machine how such a defective piece of equipment could have been built, Lorenz was told that his superiors had directed that the machine be built for not more than $10,000 rather than the $25,000 allocated to the project.

The third project Lorenz undertook was an attempt to demonstrate Martin Marietta's ability to perform certain work for a NASA space vehicle known as "The Tug." The contemplated use of the Tug was to transport astronauts in space from one area to another. Lorenz's involvement in the project was to investigate and evaluate the fracture propensities of thin gauge aluminum to be used in the fuel tank. Lorenz testified that, although he was pressured by his superiors to attest to the adequacy of certain materials, he refused to write a final report attesting to the quality of the materials. His refusal was based on his professional opinion that the materials had not been subjected to adequate testing. According to Lorenz, he told his superiors that to compromise on this issue would jeopardize his integrity and his usefulness to Martin Marietta as an expert and, in addition, would constitute a fraud on NASA.

Despite the fact that at this time Lorenz was extremely busy with various job responsibilities at Martin Marietta, he received a telephone call from his supervisor on July 22, 1975, in which he was told that Martin Marietta was laying him off for

lack of work as of July 25, 1975. Lorenz testified that he did not regard the telephone call as a final decision to fire him, but rather hoped that there had been some "horrible mistake" which would be corrected. Lorenz returned to work at Martin Marietta on the next three days and performed his usual activities on the job. His last day of employment was July 25, 1975.

On July 24, 1981, Lorenz filed a tort claim against Martin Marietta for wrongful discharge. The trial court, at the conclusion of Lorenz's case, ruled that Colorado did not recognize a claim for wrongful discharge and that his claim was time-barred by the passage of more than six years following the notice of termination given to him on July 22, 1975. The trial court accordingly entered a directed verdict against Lorenz.

Lorenz appealed to the court of appeals, which reversed the directed verdict and remanded the case for a new trial. The court of appeals held that Lorenz had established a *prima facie* case of wrongful discharge pursuant to the public-policy exception to the at-will employment doctrine. In so holding, the court of appeals concluded that Lorenz's evidence, when viewed in a light most favorable to him, established the following elements of a cognizable wrongful discharge claim outlined in its 1988 decision in *Cronk v. Intermountain Rural Elec. Ass'n*, 765 P.2d 619: that Lorenz refused to perform an act ordered by his employer, Martin Marietta; that the act would violate a specific statute, namely, 18 U.S.C. § 1001 (1988), which, being more than a broad and general statement of policy, specifically prohibits the knowing and willful making of any false or fraudulent statement or representation to any department or agency of the United States; and that Lorenz's termination resulted from his refusal to perform the act directed by his employer. *Lorenz*, 802 P.2d at 1149–50. In addition, the court of appeals concluded that, under Colorado's test for retroactive application of a judicial decision, *see People in Interest of C.A.K.*, 652 P.2d 603, 607 (1982), the *Cronk* decision should be retroactively applied to Lorenz's claim because it involved conduct that was clearly prohibited by fed-

eral law, because retroactive application would further the purpose and effect of the public-policy exception to the at-will employment doctrine, and because the equities favored retroactive application in order to avoid penalizing Lorenz for his responsible actions and releasing Martin Marietta from any liability for its alleged tortious conduct. *Lorenz*, 802 P.2d at 1150. Finally, the court of appeals held that the six-year limitation period applicable to Lorenz's 1975 tort claim, *see* § 13–80–110(1)(g), 6 C.R.S. (1973), began to run on July 26, 1975, the date following Lorenz's termination, rather than on July 22, 1975, the date on which Lorenz was notified of his discharge, and that, consequently, Lorenz's claim was timely filed. We granted Martin Marietta's petition for certiorari to consider the court of appeals' resolution of these three issues.

## II.

We consider first the cognizability of an at-will employee's tort claim for wrongful discharge predicated on the employee's refusal to comply with an employer's order or directive to perform an unlawful act. Martin Marietta argues that, even if we endorse the public-policy exception to the at-will employment doctrine, a claim for wrongful discharge must be based on a specific statutory prohibition evincing a clear public policy relating to an employer's job-related responsibilities and that the generic fraud proscription of 18 U.S.C. § 1001 (1988) does not meet that standard.

We have not previously ruled on the cognizability of a claim for wrongful discharge. Courts of other jurisdictions, however, have addressed this question in varied contexts, as has our court of appeals. Before addressing the merits of Martin Marietta's argument, therefore, we will review the general state of the law on the cognizability of a claim for wrongful discharge, as well as the decisions of our own court of appeals on that issue.

## A.

A basic common-law doctrine was that, in the absence of an explicit contract to the

contrary, every employment is presumed to be an "at-will" employment. *See* C. Summers, *Individual Protection Against Unjust Dismissal: Time for a Statute,* 62 Va.L.Rev. 481, 484 (1976). Reinforcing this basic rule was a special rule of mutuality of obligation, pursuant to which either the employer or the employee was free to terminate the employment at any time for no cause whatever and without notice. *Id.* at 484–85. The at-will employment doctrine thus evolved to the point where both employer and employee could terminate the employment relationship without thereby being subjected to legal liability for the termination. *See Cloutier v. Great Atlantic & Pac. Tea Co., Inc.,* 121 N.H. 915, 436 A.2d 1140, 1142 (1981). In the latter part of this century, however, courts have come to recognize that the at-will employment doctrine implicates not only an employer's discretion in hiring and firing but also the important interest of the employee in holding on to a job and society's interest in fixing a proper balance between the two. *Id.* 436 A.2d at 1143.[1]

Cognizant of the varied interests implicated by the employment relationship, courts have engrafted on the at-will employment doctrine what has become known as the public-policy exception. This exception was first articulated in *Petermann v. International Bhd. of Teamsters Local Union 396,* 174 Cal.App.2d 184, 344 P.2d 25 (1959). Petermann, who was hired as a business agent for a local union for as long as his work was satisfactory, filed a civil action against the union for wrongful discharge, claiming that he was fired for failing to comply with a union directive that he give false testimony before a legislative committee. In reversing the trial court's entry of judgment against Petermann on the pleadings, the California Court of Appeal stated that, although an employment of no fixed duration is generally terminable

at the will of either the employer or the employee, the employer's right to discharge an at-will employee may be limited by "considerations of public policy." 344 P.2d at 27. Acknowledging that the term "public policy" is not subject to precise definition, the court, quoting *Story on Contracts,* stated that the term was intended to convey "that principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good." *Id.* Given that sense of the term, the court went on to conclude as follows:

> The presence of false testimony in any proceeding tends to interfere with the proper administration of public affairs and the administration of justice. It would be obnoxious to the interests of the state and contrary to public policy and sound morality to allow an employer to discharge any employee, whether the employment be for a designated or unspecified duration, on the ground that the employee declined to commit perjury, an act specifically enjoined by statute. The threat of criminal prosecution would, in many cases, be a sufficient deterrent upon both the employer and the employee, the former from soliciting and the latter from committing perjury. However, in order to more fully effectuate the state's declared policy against perjury, the civil law, too, must deny the employer his generally unlimited right to discharge an employee whose employment is for an unspecified duration, when the reason for the dismissal is the employee's refusal to commit perjury. To hold otherwise would be without reason and contrary to the spirit of the law.

344 P.2d at 27.

Following the lead of *Petermann,* courts in the majority of states now recognize a cause of action for wrongful discharge pur-

---

1. Although we have held that there is a presumption that an employee hired for an indefinite period of time is an at-will employee who may be terminated for no cause whatever at any time, we have also acknowledged that this presumption is not absolute and may be rebutted under certain circumstances. *See Continental Air Lines, Inc. v. Keenan,* 731 P.2d 708, 711

(Colo.1987) (employee hired under contract terminable at will may enforce termination procedures in employee manual under contractual principles of offer and acceptance or under doctrine of promissory estoppel); *accord, Churchey v. Adolph Coors Co.,* 759 P.2d 1336, 1348 (Colo. 1988).

suant to the public-policy exception to the at-will employment doctrine. By 1975, the year in which Lorenz's claim accrued, six states had addressed the cognizability of a claim for wrongful discharge based on the public-policy exception. Four of these states held that such a claim was cogniza-

**2.** The four states upholding a claim for wrongful discharge under the public policy exception were California, Indiana, New Hampshire, and Oregon: *Petermann v. International Bhd. of Teamsters Local 396,* 174 Cal.App.2d 184, 344 P.2d 25 (1959) (employee terminated for refusing to commit perjury); *Frampton v. Central Indiana Gas Co.,* 260 Ind. 249, 297 N.E.2d 425 (1973) (employee terminated for filing a workmen's compensation claim); *Monge v. Beebe Rubber Co.,* 114 N.H. 130, 316 A.2d 549 (1974) (employee discharged for refusing the sexual advances of her superior); *Nees v. Hocks,* 272 Or. 210, 536 P.2d 512 (1975) (employee discharged for refusing to evade jury duty).

Pennsylvania and Louisiana concluded that a cause of action did not exist under the circumstances of the case, but neither state expressly rejected the public policy exception. *See Geary v. United States Steel Corp.,* 456 Pa. 171, 319 A.2d 174 (1974) (court suggested in dicta that a public policy exception to employment at will might exist under certain circumstances); *Stephens v. Justiss–Mears Oil Co.,* 300 So.2d 510 (La.App.1974) (worker's compensation case in which Louisiana court denied relief by distinguishing the *Frampton* case, but did not expressly reject the cause of action). Louisiana, however, later rejected the exception in *Gil v. Metal Serv. Corp.,* 412 So.2d 706 (La.App.1982).

**3.** The reported decisions of the thirty-seven jurisdictions which recognize some form of legal claim for wrongful discharge under the public policy exception are: *Luedtke v. Nabors Alaska Drilling Inc.,* 768 P.2d 1123 (Alaska 1989); *Wagenseller v. Scottsdale Memorial Hosp.,* 147 Ariz. 370, 710 P.2d 1025 (1985); *Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980); *Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 427 A.2d 385 (1980); *Parnar v. Americana Hotels, Inc.,* 65 Haw. 370, 652 P.2d 625 (1982); *Jackson v. Minidoka Irrigation Dist.,* 98 Idaho 330, 563 P.2d 54 (1977); *Palmateer v. International Harvester Co.,* 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981); *Frampton v. Central Indiana Gas Co.,* 260 Ind. 249, 297 N.E.2d 425 (1973); *Coleman v. Safeway Stores, Inc.,* 242 Kan. 804, 752 P.2d 645 (1988); *Firestone Textile Co. v. Meadows,* 666 S.W.2d 730 (Ky.1983); *Adler v. American Standard Corp.,* 291 Md. 31, 432 A.2d 464 (1981); *Gram v. Liberty Mut. Ins. Co.,* 384 Mass. 659, 429 N.E.2d 21 (1981); *Trombetta v. Detroit, Toledo & Ironton R. Co.,* 81 Mich.App. 489, 265 N.W.2d 385 (1978); *Phipps v. Clark Oil & Ref. Corp.,* 396 N.W.2d 588 (Minn.App.1986), *aff'd* 408 N.W.2d 569 (Minn.1987); *Boyle v. Vista Eyewear, Inc.,*

ble.[2] Today, of the forty-seven jurisdictions that have ruled on the public-policy exception, thirty-seven have recognized some form of legal cause of action for wrongful or retaliatory discharge,[3] while only nine jurisdictions have declined to recognize such a claim.[4]

700 S.W.2d 859 (Mo.Ct.App.1985); *Keneally v. Orgain,* 186 Mont. 1, 606 P.2d 127 (1980); *Ambroz v. Cornhusker Square Ltd.,* 226 Neb. 899, 416 N.W.2d 510 (1987); *Hansen v. Harrah's,* 100 Nev. 60, 675 P.2d 394 (1984); *Cloutier v. Great Atlantic & Pac. Tea Co., Inc.,* 121 N.H. 915, 436 A.2d 1140 (1981); *O'Sullivan v. Mallon,* 160 N.J.Super. 416, 390 A.2d 149 (1978); *Chavez v. Manville Products Corp.,* 108 N.M. 643, 777 P.2d 371 (1989); *Coman v. Thomas Mfg. Co., Inc.,* 325 N.C. 172, 381 S.E.2d 445 (1989); *Krein v. Marian Manor Nursing Home,* 415 N.W.2d 793 (N.D.1987); *Burk v. K–Mart Corp.,* 770 P.2d 24 (Okl.1989); *Delaney v. Taco Time Int'l, Inc.,* 297 Or. 10, 681 P.2d 114 (1984); *Reuther v. Fowler & Williams, Inc.,* 255 Pa.Super. 28, 386 A.2d 119 (1978); *Cummins v. EG & G Sealol, Inc.,* 690 F.Supp. 134 (D.R.I.1988) (citing *Volino v. General Dynamics,* 539 A.2d 531 (R.I.1988), for implicit recognition of cause of action); *Ludwick v. This Minute of Carolina, Inc.,* 287 S.C. 219, 337 S.E.2d 213 (1985); *Johnson v. Kreiser's, Inc.,* 433 N.W.2d 225 (S.D.1988); *Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733 (Tex.1985); *University Computing Co. v. Olsen,* 677 S.W.2d 445 (Tenn.1984); *Bowman v. State Bank of Keysville,* 229 Va. 534, 331 S.E.2d 797 (1985); *Payne v. Rozendaal,* 147 Vt. 488, 520 A.2d 586 (1986); *Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 685 P.2d 1081 (1984); *Harless v. First Nat'l Bank in Fairmont,* 162 W.Va. 116, 246 S.E.2d 270 (1978); *Brockmeyer v. Dun & Bradstreet,* 113 Wis.2d 561, 335 N.W.2d 834 (1983); and *Griess v. Consolidated Freightways Corp. of Delaware,* 776 P.2d 752 (Wyo.1989). A thirty-eighth state, Arkansas, denied relief under the particular circumstances of the case under review, but suggested that a claim might be available under other circumstances. *M.B.M. Co., Inc. v. Counce,* 268 Ark. 269, 596 S.W.2d 681 (1981).

**4.** The decisions of the nine jurisdictions which have declined to recognize a claim are: *Hoffman–La Roche, Inc. v. Campbell,* 512 So.2d 725 (Ala.1987); *Asher v. A.I. DuPont Inst. of Nemours Found.,* 1987 WL 14876 (unpublished opinion, Del.Super.1987); *Sorrells v. Garfinckle's, Brooks Bros., Miller & Rhoades, Inc.,* 565 A.2d 285 (D.C.App.1989); *Smith v. Piezo Technology and Professional Administrators,* 427 So.2d 182 (Fla.1983); *Evans v. Bibb Co.,* 178 Ga.App. 139, 342 S.E.2d 484 (1986); *Gil v. Metal Service Corp.,* 412 So.2d 706 (La.App.1982); *Perry v. Sears, Roebuck & Co.,* 508 So.2d 1086 (Miss. 1987); *Murphy v. American Home Products*

The essence of the public-policy exception is that an employee will have a cognizable claim for wrongful discharge "if the discharge of the employee contravenes a clear mandate of public policy." *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 685 P.2d 1081, 1089 (1984). Claims for wrongful discharge under the public-policy exception have included termination of employees for: (1) refusal to participate in illegal activity, *Petermann*, 344 P.2d 25; *Trombetta v. Detroit, Toledo & Ironton R. Co.*, 81 Mich.App. 489, 265 N.W.2d 385 (1978); (2) the employee's refusal to forsake the performance of an important public duty or obligation, *Nees v. Hocks*, 272 Or. 210, 536 P.2d 512 (1975); (3) the employee's refusal to forego the exercise of a job-related legal right or privilege, *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249, 297 N.E.2d 425 (1973); (4) the employee's "whistleblowing" activity or other conduct exposing the employer's wrongdoing, *Cummins v. EG & G Sealol, Inc.*, 690 F.Supp. 134 (D.R.I.1988); *Harless v. First Nat. Bank in Fairmont*, 162 W.Va. 116, 246 S.E.2d 270 (1978); and (5) the employee's performance of an act that public policy would encourage under circumstances where retaliatory discharge is supported by evidence of employer's bad faith, malice, or retaliation, *Cloutier*, 436 A.2d 1140.

### B.

The Colorado Court of Appeals, consistent with national developments in employment law, has considered the cognizability of a claim for wrongful discharge based on the public-policy exception in a variety of contexts. In *Lampe v. Presbyterian Medical Center*, 41 Colo.App. 465, 590 P.2d 513 (1978), the court concluded that the general language of the statutory scheme relating to the regulation of professional nursing, upon which the nurse-employee relied for her claim, did not manifest a legislative intent to modify the general rule that "an indefinite general hiring is terminable at will by either party." 41 Colo.App. at 468, 590 P.2d at 516.[5] In contrast to *Lampe*, the court in *Montoya v. Local Union III of Int'l Bhd. of Elec. Workers*, 755 P.2d 1221 (Colo.App.1988), held that an employee's claim for wrongful discharge was cognizable where the employee alleged his discharge was the result of a refusal to participate in the embezzlement of union funds in violation of the Labor Management Reporting and Disclosure Act, 29 U.S.C. §§ 401 to 531 (1982).

Subsequent to *Montoya*, the court of appeals in 1988 decided *Cronk v. Intermountain Rural Elec. Ass'n*, 765 P.2d 619. *Cronk*, an at-will employee of a public utility, sued the public utility for wrongful discharge based on his termination for refusing to engage in several illegal acts in violation of the Colorado Public Utility Law, §§ 40-1-101 to 40-7-111, 17 C.R.S. (1984 & 1991 Supp.) (i.e., waiving extension fees for favored developers, requiring employees to keep a "list of favors done," and awarding contracts for work without competitive bidding) and also for testifying

*Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983); and *Phung v. Waste Management, Inc.*, 23 Ohio St.3d 100, 23 OBR 260, 491 N.E.2d 1114 (1986). As far as we can determine, Iowa, Maine, and Utah have not yet ruled on the issue.

5. The court of appeals followed *Lampe* in *Corbin v. Sinclair Marketing, Inc.*, 684 P.2d 265 (Colo.App.1984), where it upheld dismissal of an at-will employee's complaint for wrongful discharge predicated on the employee's refusal to perform an act contrary to safety regulations. The employee based his claim on the policy of the Occupational Safety and Health Act (now codified at 29 U.S.C. § 654(a) (1988)), which is to require an employer to provide employees with a safe place of employment free from recognized hazards, the policy of the Colorado Minimum Wage Act, § 8-6-104, 3 C.R.S. (1973), which is to prohibit the employment of workers under conditions detrimental to their health or morals, and the policy of the Labor Peace Act, § 8-3-108(2)(a), 3 C.R.S. (1973), which makes it unlawful to coerce or intimidate an employee in the enjoyment of the employee's legal rights. The policies relied on by the employee, in the court of appeals' view, were of the same character as the broad and general statements of policy found inadequate in *Lampe* "to justify adoption of an exception to the rule that an indefinite general hiring is terminable at will by either party to the employment." *Corbin*, 684 P.2d at 267. In addition, the court of appeals in *Corbin* held that the public policy exception was not available "when, as does 29 U.S.C. § 660(c), the statute at issue provides to the employee a wrongful discharge remedy which he alleged was pursued." *Id.*

about those acts in a hearing conducted by the Public Utilities Commission. In reversing the trial court's entry of summary judgment for the employer, the court of appeals acknowledged that an employment for an indefinite duration is generally terminable at will, but went on to hold that a claim for a wrongful discharge predicated on the public-policy exception is cognizable in Colorado if the evidence establishes that the employee refused to carry out an order violative of a specific statute, the terms of which are more than a broad and general statement of policy, and that the employee was discharged as a result of refusing to perform the act ordered by the employer. *Id.* at 622. Because the affidavits proffered by Cronk in support of his claim were sufficient to withstand the employer's motion for summary judgment, the court remanded the case to the trial court for further proceedings.

The *Cronk* public-policy exception to the at-will employment doctrine was somewhat expanded in *Lathrop v. Entenmann's, Inc.*, 770 P.2d 1367 (Colo.App.1989). Lathrop's claim for wrongful discharge was based upon his employer's alleged retaliation against him for exercising his right to receive workers' compensation benefits rather than, as in *Cronk*, for refusing an employer's directive to violate a specific statute. Initially emphasizing that an employer has a statutory duty to provide workers' compensation benefits and that an injured employee has a statutory right to receive such benefits, the court drew on the analysis of the Indiana Supreme Court in *Frampton*, 297 N.E.2d 425, and reasoned as follows:

> [T]o allow an employer to terminate the employment of an employee in retaliation for the employee's pursuit of a workmen's compensation claim would open the doors to "coercion and other duress-provoking acts," whereby employers could, by threat of retaliation, discourage or prevent employees from seeking the benefits due them and thereby undermine the fundamental purposes of the workmen's compensation system.

770 P.2d at 1372. The court then concluded that "an employer's retaliation against such an employee for his exercise of such right violates Colorado's public policy" and "provides the basis for a common law claim by the employee to recover damages sustained by him as a result of that violation." *Id.* at 1373.

## C.

■ It is within the framework of the aforementioned case law that we now hold, in keeping with the majority of jurisdictions, that a cause of action under the public-policy exception to the at-will employment doctrine is cognizable in the State of Colorado. In so holding, we approve, with minor modifications hereinafter discussed, the court of appeals' decision in *Cronk*.

Long before the emergence of the public-policy exception to the at-will employment doctrine, Colorado case law endorsed the principle that a contract violative of public policy should not be enforced. For example, in *Russell v. Courier Printing & Publishing Co.*, 43 Colo. 321, 95 P. 936 (1908), this court refused to enforce a contract between two newspapers relating to the publication of proposed constitutional amendments. The contract was between the Fort Collins Express, which had entered into a contract with the Secretary of State for a weekly publication of the proposed amendments, and the Daily Courier. The contract provided that, on the condition that the Daily Courier would be successful in receiving a contract for daily publication from the Secretary of State, the Express would relinquish its contract with the Secretary of State in exchange for receiving one-half of the money received by the Daily Courier for daily publication of the constitutional amendments, less such sum of money as may be paid by the Daily Courier to the Republican State Central Committee. In holding the contract unenforceable, the court began its analysis with the proposition that "[p]ublic policy, with respect to the administration of the law, is that rule of law which declares that no one can lawfully do that which tends to injure the public, or is detrimental to the public good." 43 Colo. at 325, 95 P. at 938. It

thus was axiomatic, in the court's view, that "[a]ll contracts contrary to public policy are void." *Id.* It matters not, the court reasoned, that the parties entered into the agreement in good faith, or that improper means were not contemplated to bring about the result intended by the parties. 43 Colo. at 328, 95 P. at 939. Rather, the critical consideration was that the contract contemplated a result that was dependent "entirely upon a contingency of such a character that it offered a temptation to resort to improper means to bring it about" and that "[f]or this reason the tendency of the contract under consideration was evil, without reference to the question of whether fraud was intended by the parties or employed in its execution." *Id.*[6]

■ In light of Colorado's long-standing rule that a contract violative of public policy is unenforceable, it is axiomatic that a contractual condition, such as the terminability condition of an at-will employment contract, should also be deemed unenforceable when violative of public policy. There is no question that the manifest public policy of this state is that neither an employer nor an employee should be permitted to knowingly perpetrate a fraud or deception on the federal or state government. A corollary of this policy is that an employee, whether at-will or otherwise, should not be put to the choice of either obeying an employer's order to violate the law or losing his or her job.

■ Moreover, we know of no reason why the public-policy exception should not apply to the discharge of an employee either because of the employee's performance of an important public obligation, *see Nees*, 536 P.2d 512 (wrongful discharge claim predicated on employee's jury duty); § 13–71–134(1), 6A C.R.S. (1991 Supp.) (prohibiting discharge or harassment of employee for employee's jury duty), or because of the employee's exercise of a statutory right or privilege granted to workers, *see Lathrop*, 770 P.2d 1367 (wrongful discharge claim based on employee's filing of workers' compensation claim); *Frampton*, 297 N.E.2d 425 (same). Applying the public-policy exception to these situations is entirely consistent with its underlying rationale, which is to prohibit an employer from placing an employee in the position of keeping a job only by performing an illegal act, foresaking a public duty, or foregoing a job-related right or privilege. An at-will employee, therefore, will establish a *prima facie* case for wrongful discharge under the public-policy exception if the employee presents evidence on the following elements: that the employer directed the employee to perform an illegal act as part of the employee's work related duties or prohibited the employee from performing a public duty or exercising an important job-related right or privilege; that the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or the employee's right or privilege as a worker; and that the employee was terminated as the result of refusing to perform the act directed by the employer. To these elements we add the additional requirement that the employee present evidence showing that the employer was aware, or reasonably should have been aware, that the employee's refusal to comply with the employer's order or directive was based on the employee's reasonable belief that the action ordered by the employer was illegal, contrary to clearly expressed statutory policy relating to the employee's duty as a citizen, or violative of the employee's legal right or privilege as a worker.

**6.** As early as 1881 this court held that a contractual condition prohibiting a railroad from building a side track at the town of El Moro was violative of the public policy of requiring railroads to accommodate the public in matters of transportation and travel and, accordingly, refused to enforce the contractual condition. *Pueblo & Arkansas Valley R.R. Co. v. Taylor*, 6 Colo. 1 (1881); *see also Wood v. Casserleigh*, 30 Colo. 287, 291, 71 P. 360, 361 (1902) (recognizing basic rule that a contract may be declared illegal as contrary to public policy when "it is obnoxious to the pure administration of justice, or manifestly injurious to the interests of the public").

This additional evidentiary requirement, we believe, will have two salutary effects. It should result in providing the employer with a fair opportunity to distinguish between the conscientious employee concerned about the legality of particular conduct demanded by the employer and the employee who refuses to carry out an order or directive not as a result of any concern for the legality of the employer's demand but out of insubordination or some improper motive. Furthermore, the added requirement should result in providing the employer with fair notice, prior to the discharge decision, of circumstances supportive of the employee's reasonable belief that the action directed by the employer would be manifestly illegal, would be contrary to the employee's duty as a citizen, or would abridge the employee's right or privilege as a worker. While this requirement places on the employee an evidentiary burden not articulated by the court of appeals in *Cronk*, it does not alter in a fundamental way the basic nature of the tort claim for wrongful discharge outlined in the *Cronk* decision.

We recognize, of course, that the public-policy exception to the at-will employment doctrine does place some limits on an employer's discretion in discharging at-will employees previously hired for an unspecified duration. We are satisfied, however, that the essential elements for a valid claim under the standard adopted herein will effectively accommodate the employer's interest in worker efficiency and loyalty among the workforce, the employee's interest in not being forced to choose between, on the one hand, losing a job and, on the other, engaging in illegal conduct or conduct contrary to the employee's civic responsibility or statutory right or privilege, and society's interest in maintaining a proper balance between the two.

### D.

■ We now consider whether Lorenz established a *prima facie* case of wrongful discharge under the public-policy exception. In our analysis of this issue, we note that *Cronk*, 765 P.2d 619, was decided by the court of appeals on September 15, 1988, and that the trial of the instant case commenced on September 15, 1986. Because the parties did not have the benefit of either the *Cronk* decision or this court's opinion relating to the additional element of a wrongful discharge claim under the public-policy exception, they obviously were at some considerable disadvantage "in marshalling evidence in support of and in defense of a claim which might or might not be legally cognizable and, if legally cognizable, might or might not encompass the particular circumstances of this case." *Perreira v. State*, 768 P.2d 1198, 1220 (Colo.1989). Unless, therefore, the public-policy exception adopted in *Cronk* is to be given prospective effect only, or unless Lorenz's claim is barred by the statute of limitations—and we will address both these issues in parts III and IV, *infra*,—then the proper disposition of this case is to remand Lorenz's wrongful discharge claim for a new trial under the test herein adopted, so long as the record demonstrates that Lorenz satisfied the *Cronk* standard for a wrongful discharge claim. We emphasize here that Martin Marietta has conceded that there was evidence showing that Lorenz refused to perform an action, that such action was ordered by his employer, and that Lorenz was terminated for refusing to perform the action. The element contested by Martin Marietta is whether the action that Lorenz was directed to perform would have violated a specific statutory proscription relating to Lorenz's duties or responsibilities as a Martin Marietta employee, rather than merely being contrary to a broad and general statement of public policy.

■ With respect to the specificity of the statutory proscription on which Lorenz's claim for wrongful discharge rests, Martin Marietta argues that the provisions of 18 U.S.C. § 1001 (1988) reflect only a generic proscription against fraud and are not sufficiently specific to support a claim for wrongful discharge. We are of a contrary view.

18 U.S.C. § 1001 (1988) states:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

This statutory prohibition is designed to protect governmental departments and agencies from the perversion that might result from the deceptive practices described in the statute. *United States v. Tobon–Builes,* 706 F.2d 1092, 1096 (11th Cir.1983). In order to achieve its objective, the statute proscribes two distinct offenses: knowingly and willfully making a false or fraudulent representation; and knowingly and willfully concealing a material fact. *Id.* A false representation under § 1001 requires proof "that the defendant knowingly made a false or fraudulent statement; 'concealment requires proof of willful nondisclosure by means of a trick, scheme, or device.'" *Id.* (quoting *United States v. Diogo,* 320 F.2d 898, 902 (2nd Cir.1963)).

■ Courts have determined that the discharge of an employee for refusing to perform acts violative of 18 U.S.C. § 1001, or violative of similar statutory proscriptions, will support a claim for wrongful discharge under the public-policy exception. In reaching this result, the Illinois Court of Appeals in *Johnson v. World Color Press, Inc.,* 147 Ill.App.3d 746, 101 Ill.Dec. 251, 498 N.E.2d 575 (1986), remarked that public policy favors full disclosure and truthfulness in financial reports to the government and that 18 U.S.C. § 1001 "establishes a clearly mandated public policy against deceptive practices aimed at frustrating or impeding legitimate functions of government departments or agencies." 101 Ill. Dec. at 254, 498 N.E.2d at 578. Other courts have reached similar results under similar statutory proscriptions. *See, e.g., Trombetta,* 265 N.W.2d 385 (dismissal of employee for refusing to make a false statement or representation to government in violation of Michigan statute); *Harless,* 246 S.E.2d 270 (dismissal of employee for reporting employer's violation of consumer credit protection laws). The clearly expressed policy of 18 U.S.C. § 1001 favors truthfulness and accuracy in governmental reports and is sufficiently specific to support a claim for wrongful discharge as a result of an employee's refusal to engage in conduct violative of that statutory proscription. Such a result, we believe, is entirely consistent with the principle that employees should not be forced to choose between losing their jobs or engaging in criminal conduct.

The evidence at trial demonstrated that Lorenz had a duty as principal investigator of several NASA projects to report quality control deficiencies, that he refused his superior's order to misrepresent to the government such deficiencies as well as unrealistic cost assessments resulting in false contract prices, that carrying out his superior's orders would have violated the specific provisions of 18 U.S.C. § 1001, and that the reason for Lorenz's termination was his refusal to obey his employer's direction. We thus conclude that Lorenz did present sufficient evidence at trial to establish a *prima facie* case for wrongful discharge under the public-policy exception to the at-will employment doctrine, as outlined in *Cronk,* 765 P.2d 619.

### III.

■ We next address whether the court of appeals' 1988 decision in *Cronk,* 765 P.2d 619, which adopted the public-policy exception as the basis for a tort claim for wrongful discharge, announced a new rule of law and thus should be applied prospectively only or should be retroactively applied to Lorenz's claim arising out of his discharge in July 1975. As a general rule, statutes operate prospectively, while judicial decisions are applied retroactively. *See United States v. Security Industrial Bank,* 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982). Under certain circumstances, however, judicial decisions are

given prospective effect only. In *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the United States Supreme Court announced the following three-part test for determining whether a judicial decision should be applied retroactively to civil litigation in the federal courts:

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed.... Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." ... Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

404 U.S. at 106–07, 92 S.Ct. at 355 (citations omitted).

The United States Constitution neither prohibits nor requires retroactive application of a judicial decision, and the question of retrospective or prospective application of a state judicial decision to civil litigation in the state courts is a matter of state law when, as here, the rule in question involves a matter of a common-law tort and is not based on federal constitutional or statutory law. *See Great Northern Ry. Co. v. Sunburst Oil & Ref. Co.,* 287 U.S. 358, 364, 53 S.Ct. 145, 148, 77 L.Ed. 360 (1932); *James B. Beam Distilling Co. v. Georgia,* —— U.S. ——, 111 S.Ct. 2439, 2443, 115 L.Ed.2d 481 (1991) (Souter, J., announcing judgment of court, joined by Stevens, J.).[7] We adopted the *Chevron* three-part test for determining retroactive or prospective application of a judicial decision to state litigation in *People in the Interest of C.A.K.,* 652 P.2d 603 (Colo. 1982), and reaffirmed that three-part test in *Marinez v. Industrial Comm'n of Colorado,* 746 P.2d 552, 556 (Colo.1987). It is the three-part test of *Chevron,* therefore, which provides the controlling standard for

7. In *James B. Beam Distilling Co.,* the Supreme Court considered whether its ruling in *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), which invalidated as violative of the Commerce Clause a Hawaii law imposing an excise tax on imported alcoholic products at a rate considerably higher than that applicable to local alcoholic products, should apply retroactively to a claim antedating *Bacchus* raised in Georgia state litigation involving a statute virtually identical to the Hawaii statute in *Bacchus.* In concluding that the application of the rule in *Bacchus* requires its application in later cases, Justice Souter distinguished between retroactivity as a "choice of law" question between the forward and backward operation of the rule in question and retroactivity as a question of remedies—i.e., once a rule is determined to apply "backward," the question arises as to whether the party prevailing under a new rule should obtain the same relief that would have been available if the rule had been an old one. 111 S.Ct. at 2443. This latter remedial inquiry, Justice Souter noted, is "one governed by state law, at least where the case originates in state court," but "the antecedent choice-of-law question is a federal one where the rule at issue itself derives from federal law, constitutional or otherwise." *Id.* at 2443. Justice Souter then went on to conclude that

because "*Bacchus* is fairly read to hold as a choice of law that its rule should apply retroactively to litigants then before the Court," *id.* at 2445, the Georgia court erred in refusing to apply the *federal* rule announced in *Bacchus.* The *Chevron Oil* analysis, in Justice Souter's view, cannot determine the choice of law issue by relying on the equities of the case when, as in *Bacchus,* the Court has already applied the federal law announced in that case to the litigants then before the Court. *Id.* at 2447. Under such circumstances, Justice Souter concludes, the same rule must be applied "to all others not barred by procedural requirements or res judicata." *Id.* at 2448.

In the instant case, we could employ Justice Souter's analysis and conclude that, as a matter of state law, once a new rule of substantive law, such as the *Cronk* rule, is applied to litigants then before the court, it must be applied to all others not barred by procedural requirements or res judicata. We decline, however, to follow such a course. Because we deal in this case with the issue of retroactive application of a state judicial decision announcing a rule of tort law and not a rule deriving from federal constitutional or statutory law, we continue to adhere to the *Chevron* analysis in resolving the issue of retroactive or prospective application of the state judicial decision.

resolving the issue of the retroactive application of the public-policy exception to the at-will employment doctrine as the basis for a tort claim for wrongful discharge.

## A.

Because "[t]he question of retroactivity arises only when a decision establishes a new rule of law," we need address the second and third factors of the *Chevron* standard only if we can say with fair assurance that *Cronk* did establish a new rule of law for the State of Colorado. *Marinez*, 746 P.2d at 557. To establish a new rule of law, a judicial decision must either overrule clear past precedent on which the litigants may have relied or must resolve an issue of first impression not clearly foreshadowed by prior precedent. *Chevron*, 404 U.S. at 106, 92 S.Ct. at 355. *Loffland Bros. Co. v. Industrial Claim Appeals Panel of Colorado*, 770 P.2d 1221, 1225 (Colo.1989).

In arguing that the *Cronk* decision overruled past Colorado precedent which authorized the discharge of an at-will employee for any reason whatever or for no reason at all, Martin Marietta places heavy reliance on *Justice v. Stanley Aviation Corp.*, 35 Colo.App. 1, 530 P.2d 984 (1974). The court of appeals held in *Justice* that "[u]nless the circumstances indicate otherwise, a contract which sets forth an annual salary rate but states no definite term of employment is considered to be indefinite employment, terminable at the will of either party without incurring liability for breach of contract." 35 Colo.App. at 4, 530 P.2d at 985. Contrary to Martin Marietta's argument, *Justice* did not confer an absolute right upon an employer to terminate an employee at will, but rather provided an employer with a qualified right to terminate "unless the circumstances indicate otherwise." This interpretation of *Justice* is consistent with the basic rule of employment law that the presumption of at-will employment "should not be considered absolute but rather should be rebuttable under certain circumstances." *Keenan*, 731 P.2d at 711.

The fact that we can say that the *Cronk* decision did not overrule clear past precedent does not resolve whether *Cronk* involved an issue of first impression not clearly foreshadowed by prior precedent. Although at the time of Lorenz's discharge in 1975 a Colorado appellate court had not ruled on the cognizability of a claim for wrongful discharge under the public-policy exception, one could muster several factors to support the proposition that there then existed an emerging doctrinal rationale for Colorado's eventual adoption of the public-policy exception to the at-will employment doctrine. These factors would include the following: four other states already had adopted the public-policy exception to the at-will employment doctrine, *see* Part II(A), supra; this court had previously held in *Russell*, 43 Colo. 321, 95 P. 936, that contracts violative of public policy were unenforceable; and a 1948 federal statute prohibited a person from making a false or fraudulent statement to any department or agency of the United States, ch. 645, 62 Stat. 683, 749 (presently codified at 18 U.S.C. § 1001 (1988)). To say that there was an emerging doctrinal basis for the public-policy exception, however, is not the equivalent of finding that the exception was "clearly foreshadowed." Simply put, we cannot conclude with fair assurance that the first element of the *Chevron* test for retroactive application has been satisfied, and for that reason we continue with the *Chevron* analysis.

## B.

The second *Chevron* factor requires a weighing of the merits and demerits of the case by assessing the history, purpose, and effect of the rule under consideration with a view to determining whether retroactive application of the rule would further or retard its operation. As previously discussed, the public-policy exception was engrafted onto the at-will employment doctrine as a rule designed to fairly accommodate the separate and somewhat distinct interests of both the employer and the employee in the employment relationship as well as society's interest in maintaining a proper balance between the two. In light

of that purpose, it is quite plain to us that the retroactive application of the public-policy exception will have the salutary effect of prohibiting an employer from discharging an employee for refusing to engage in conduct clearly illegal or detrimental to the public good—whether that conduct be the commission of a crime, the abandonment of the employee's civic duty, or the forfeiture of a job-related right or privilege. In contrast, a prospective application of the public-policy exception would deprive a discharged employee of legal redress for refusing to engage in conduct clearly illegal or detrimental to the public good. We are satisfied that, in light of the history, purpose, and effect of the public-policy exception, retroactive application of the exception to Lorenz's claim for wrongful discharge is clearly justified.

### C.

We are also convinced that, with respect to the third *Chevron* factor, retroactive application of the public-policy exception will not result in any real injustice or intolerable hardship to Martin Marietta or other similarly situated employers. We acknowledge that our decision in this case imposes on the employee the responsibility of making an evidentiary showing that, in addition to the elements for a wrongful discharge claim articulated in *Cronk*, the employer had actual or constructive knowledge that the employee's refusal to obey the employer's order or directive was based on the employee's reasonable belief that the action ordered by the employer was illegal, contrary to clearly expressed statutory policy relating to the employee's duty as a citizen, or violative of the employee's legal right or privilege as a worker. Part II C, supra, at 109. This added requirement, as we previously remarked, should enable the employer to distinguish between the conscientious employee who refuses a directive out of a legitimate concern for its legality and the employee who refuses a directive without justifiable excuse, and, as well, should provide the employer, prior to the discharge decision, with fair notice of circumstances supportive of an employee's reasonable belief that the employer's directive is unlawful. *Id.* at 109–110. In light of these considerations, it is obvious to us that the added evidentiary requirement placed on the employee enures to the sole benefit of the employer. Given that fact, it cannot plausibly be argued that the additional evidentiary requirement militates against any retroactive application of *Cronk* because it somehow results in an injustice or hardship to the employer. If anything, the more plausible argument runs in the opposite direction—that is, because the added evidentiary requirement works to the benefit of the employer, it thereby diminishes any asserted inequities resulting from a retroactive application of *Cronk*. We decline, however, to turn the case on this line of argument and instead treat the added evidentiary requirement as without legal significance to the issue of retroactivity.

Martin Marietta bases its argument for prospective application on the proposition that it relied on the terminable-at-will aspect of the at-will employment doctrine in making a conscious decision to discharge Lorenz. We find no justification, however, for countenancing the terminability condition of at-will employment as a warrant for discharging an employee solely because of the employee's refusal to engage in conduct violative of a criminal statute. In our view, the injustice or hardship resulting from a discharge decision under such circumstances falls solely on the discharged employee. Moreover, the responsibility of demonstrating the likelihood of serious adverse consequences resulting from the retroactive application of a judicial decision rightly falls on Martin Marietta. *See Marinez*, 746 P.2d at 559. Martin Marietta, however, has failed to make such a showing either with regard to itself or to other similarly situated employers. We therefore conclude that the three-part *Chevron* test for determining the retroactive application of a judicial decision weighs in favor of retroactive application of the public-policy exception to Lorenz's cause of action for his wrongful discharge in 1975.

### IV.

The final question for consideration is whether the court of appeals correct-

ly held that Lorenz's tort claim for wrongful discharge accrued on July 26, 1975, the date following his actual discharge from Martin Marietta, rather than on July 22, 1975, the date on which Lorenz was notified of his termination. If Lorenz's claim accrued on July 22, 1975, his claim for wrongful discharge would be barred by the then-existing statute of limitations applicable to a tort claim accruing in 1975. *See* § 13–80–110(1)(g), 6 C.R.S. (1973). If, on the other hand, Lorenz's claim accrued on the date of his actual discharge, July 25, 1975, or on the day following his actual discharge, as the court of appeals concluded, then Lorenz's claim was timely filed. We hold that Lorenz's claim accrued on the date of his actual discharge, July 25, 1975, and that his complaint filed on July 24, 1981, was within the applicable statute of limitations.

### A.

■ Inasmuch as a claim for wrongful discharge based on the public-policy exception to the at-will employment doctrine sounds in tort, Lorenz was required to file his complaint "within six years after the cause of action accrue[d]; and not afterwards." § 13–80–110(1)(g), 6 C.R.S. (1973). A cause of action in tort does not accrue until there is a concurrence of tortious conduct and actual injury or damages caused by the tortious conduct. *See generally DeCaire v. Public Service Co.*, 173 Colo. 402, 407, 479 P.2d 964, 966 (1971). Although Lorenz was informed on July 22, 1975, that he was being laid off as of July 25, 1975, for lack of work, he did not sustain actual injury or damage until he was discharged on July 25, 1975. Prior to that date Martin Marietta retained the power to retract the notice of termination and thereby prevent the onset of actual injury to Lorenz as a result of his termination. Indeed, Lorenz testified that when he was informed of his termination on July 22, 1975, he still held out hope that this notification was some type of mistake that would be corrected. The six-year statute of limitations applicable to Lorenz's wrongful discharge claim, therefore, did not begin to run until Lorenz was actually dis-

charged, which was on July 25, 1975, and the filing of Lorenz's complaint on July 24, 1981, was within the six-year period immediately following the date of Lorenz's actual discharge.

### B.

In arguing that Lorenz's cause of action accrued on July 22, 1975, the date on which he received notice of his termination, Martin Marietta places substantial reliance on the United States Supreme Court's decision in *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), and the court of appeals' decision in *Quicker v. Colorado Civil Rights Comm'n*, 747 P.2d 682 (Colo.App.1987). We do not regard these cases as authoritative precedent for resolving the timeliness of Lorenz's claim.

*Ricks*, 449 U.S. 250, 101 S.Ct. 498, which was decided under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 (1988) involved an action by a teacher who claimed that Delaware State College had discriminated against him on the basis of his national origin when the college denied him a tenured faculty position and subsequently discharged him from employment. Title VII of the Civil Rights Act requires an aggrieved person to file a complaint with the Equal Employment Opportunity Commission (EEOC) "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e) (1988). Pursuant to Delaware law, the limitations period for Ricks' § 1981 claim was that applicable to similar claims under Delaware law. 449 U.S. at 255 n. 5, 101 S.Ct. at 502 n. 5. Ricks was notified on June 26, 1974, that the board of trustees had decided not to grant him tenure but that Ricks would be offered a "terminal contract" for the 1974–75 school year which would expire on June 30, 1975, and would not be renewed. Ricks accepted the "terminal contract" and later, on April 4, 1975, filed an unemployment discrimination claim with the EEOC, which referred his claim to the appropriate state agency. When the Delaware Agency waived juris-

diction, the EEOC then accepted Ricks' complaint and in 1977 issued a "right to sue" letter to Ricks. Ricks thereafter filed a lawsuit on September 9, 1977, in the federal district court, alleging that the college had discriminated against him in violation of Title VII (employment discrimination) and 42 U.S.C. § 1981 (violation of civil rights).

In concluding that Ricks' federal lawsuit was untimely, the Supreme Court began its analysis with the observation that the timeliness of Ricks' complaint depended on the precise " 'unlawful employment practice' of which [Ricks] complains." 449 U.S. at 257, 101 S.Ct. at 503. The Court then reasoned that the "only alleged discrimination occurred—and the filing limitation periods therefore commenced—at the time the tenure decision was made and communicated to Ricks," even though "one of the effects of the denial of tenure—the eventual loss of a teaching position—did not occur until later." 449 U.S. at 259, 101 S.Ct. at 504. Since the alleged act of discrimination occurred on the notification date of June 26, 1974, Ricks' Title VII complaint filed with the EEOC on April 4, 1975, was beyond the one-hundred-eighty day limitations period for that claim, and Ricks' § 1981 claim filed in the district court on September 9, 1977, was similarly beyond the three year limitations period applicable to that claim.

In contrast to Ricks' lawsuit for unlawful discrimination, which accrued at the time of the commission of the unlawful act of discrimination regardless of whether loss of employment eventually ensued as a result thereof, Lorenz's tort claim for wrongful discharge required actual injury in the form of lost employment as a necessary element of the claim. Because Lorenz suffered no actual injury until he was deprived of his job, and because that deprivation did not occur until the conclusion of his last day of work on July 25, 1975, it was on the last day of his employment that his cause of action accrued.

*Quicker,* 747 P.2d 682, which was decided under the Colorado Employment Practices Act, §§ 24–34–401 to –406, 10A C.R.S. (1988), involved a complaint filed by an employee with the Colorado Civil Rights Commission, in which the employee alleged employment discrimination on the basis of a physical handicap. Section 24–34–403 of the statutory scheme states that any claim must be filed with the Civil Rights Commission "within six months after the alleged discriminatory or unfair employment practice occurred." Quicker was informed on January 14, 1985, that he was to be terminated on May 17, 1985. He thereafter filed his claim with the Civil Rights Commission on November 1, 1985. The court of appeals held that the occurrence of the alleged discriminatory or unfair practice "triggers the running of the time limit," with the result that Quicker's filing of his claim on November 1, 1985 was well beyond the six-month limitations period which commenced on January 14, 1985. 747 P.2d at 683.

Clearly, a statutory claim for redressing an unfair employment practice, which itself may be the basis for legal redress without regard to any ensuing loss of employment, is analytically distinct from the common law tort of wrongful discharge, which requires actual injury in the form of loss of employment as an essential element of the tort. The test for determining the accrual date of the former is also analytically distinct from the test applicable to the latter. *See St. Cyr v. Workers' Compensation Appeals Bd.,* 196 Cal.App.3d 468, 243 Cal. Rptr. 1, 3 (1987). We thus agree with the court of appeals that Lorenz's claim for wrongful discharge was timely filed.

We affirm the judgment of the court of appeals, and we direct that the new trial ordered by the court of appeals be conducted in accordance with the views herein expressed.

ERICKSON, J., concurs in part and dissents in part, and ROVIRA, C.J., and VOLLACK, J., join in the concurrence and dissent.

Justice ERICKSON concurring in part and dissenting in part.

The majority establishes a public-policy exception to the at-will employment doctrine and grants retroactivity to the deci-

sion announced today. The public-policy exception should be approved, but I would grant prospective rather than retrospective application of the newly created rule by applying it only to cases based on facts occurring after the announcement of this opinion. Accordingly, I respectfully dissent to the retroactive application of the public-policy exception. I concur in all other parts of the opinion.

The principle that no employee should be required to violate the law or falsify facts in order to maintain his employment is sound. In my view, the acts alleged by Paul Lorenz constitute grounds for a civil action and damages. While I agree that the rule announced today should be applied to the parties before the court, I do not agree that we should formulate new law creating liability for conduct that was not actionable in the past, and permit recovery under the public-policy exception for conduct that occurred prior to our announcement of the new rule. I would limit the application of the public-policy exception for cases predicated on conduct occurring after the announcement of this opinion.

I agree with the majority that *James B. Beam Distilling Co. v. Georgia,* — U.S. ——, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991) (plurality opinion), which rejected "selective" prospective application of a new rule in civil cases, *id.* 111 S.Ct. at 2447, does not compel this court to dispense with the analysis of the prospective or retroactive issue under the three-prong test set forth in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971). It has long been held that

> [a] state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law none the less for intermediate transactions.... The choice for any state may be determined by the juristic philosophy of the judges of her courts, their conceptions of law, its origin and nature.

*Great N. Ry. Co. v. Sunburst Oil & Ref. Co.,* 287 U.S. 358, 364–65, 53 S.Ct. 145,

148–49, 77 L.Ed. 360 (1932). The principle of state court control of the retroactivity of its decisions has been recently affirmed. *See Beam Distilling,* 111 S.Ct. at 2443; *American Trucking Ass'ns v. Smith,* 496 U.S. 167, 110 S.Ct. 2323, 2330, 110 L.Ed.2d 148 (1990) (plurality opinion) ("When questions of state law are at issue, state courts generally have the authority to determine the retroactivity of their own decisions."). Three other states have either declined to follow or have distinguished *Beam Distilling* in resolving the selective prospectivity issue. *Harper v. Virginia Dept. of Taxation,* 410 S.E.2d 629, 631 (Va.1991), *petition for cert. filed,* 60 U.S.L.W. 3406 (U.S. Nov. 15, 1991) (No. 91–794); *Devrnja v. West Virginia Bd. of Medicine,* 408 S.E.2d 346, 349 (W.Va.1991); *First Interstate Bank v. Larson,* 475 N.W.2d 538, 545 (N.D. 1991).

The *Chevron* factors were first reviewed by this court to analyze the retroactive application of an evidence standard announced by the United States Supreme Court in a parental termination proceeding. *People in the Interest C.A.K.,* 652 P.2d 603, 607–09 (Colo.1982). *C.A.K.* recognized two justifications for denying retroactive application to a judicial ruling: First, the protection of parties who relied on the earlier state of the law, and second, the protection of societally important interests in stability. *Id.* at 608 (citing Thomas S. Currier, *Time and Change in Judge-made Law: Prospective Overruling,* 51 Va.L.Rev. 201 (1965)). In relation to the first justification, we recognized:

> The reliance factor is more persuasive when the change in the law at issue concerns pre-litigation conduct that becomes the subject of later litigation, because most acts, once done, cannot be undone. Consequently, it would be inequitable to subject conduct to a standard that did not obtain when the conduct was engaged in.

*Id.* The *Chevron* analysis has three parts: (1) whether the decision at issue establishes new law, (2) whether retrospective application of the new rule would further or retard its operation, and (3) whether retrospective application of the new rule could

produce substantial inequitable results. *Chevron*, 404 U.S. at 106–07, 92 S.Ct. at 355–56. Rather than weighing the three parts together, we treat the first part— whether a new rule has been established— as a threshold question. After the threshold has been met, we then balance the remaining two factors. *Marinez v. Industrial Comm'n*, 746 P.2d 552, 557 n. 4 (Colo. 1987).

Today's decision establishes a six-factor test to determine whether an employee's discharge violates public policy and grants an exemption to the well recognized at-will employment rule.[1] To succeed in establishing a prima facie case for the tort of wrongful discharge in violation of public policy "a plaintiff must prove (1) that he refused to perform an action (2) ordered by his employer (3) which would violate a specific statute (4) whose terms are more than a broad general statement of policy and (5) that his termination resulted from his refusal," *Cronk v. International Rural Elec. Ass'n*, 765 P.2d 619, 622 (Colo.1988), as well as (6)

> that the employer was aware, or reasonably should have been aware, that the employee's refusal to comply with the employer's order or directive was based on the employee's reasonable belief that the action ordered by the employer was illegal, contrary to clearly expressed statutory policy relating to the employee's duty as a citizen, or violative of the employee's legal right or privilege as a worker.

Maj. op. at 109. The majority has engrafted the sixth step on the *Cronk* rule, creating a new principle of law that could not have been foreseen. Since the *Chevron* threshold has been met, we must now balance the remaining factors.

The second factor in *Chevron*, whether retrospective application of the new rule would further or retard its operation, was derived from an earlier criminal case, *Link-*

letter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), which held:

> Once the premise is accepted that we are neither required to apply, nor prohibited from applying a decision retrospectively, we must then weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retroactive operation will further or retard its operation. We believe that this approach is particularly correct with reference to the Fourth Amendment's prohibitions as to unreasonable searches and seizures. Rather than "disparaging" the Amendment we but apply the wisdom of Justice Holmes that "[t]he life of the law has not been logic: it has been experience."

*Id.* at 629, 85 S.Ct. at 1737 (quoting Oliver W. Holmes, *The Common Law* 5 (Howe ed. 1963)). At issue in *Linkletter* was whether the application of the exclusionary rule to the states in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), was to be applied retroactively. In examining the purpose of *Mapp*, the Court stated,

> *Mapp* had as its prime purpose the enforcement of the Fourth Amendment through the inclusion of the exclusionary rule within its rights. This, it was found, was the only effective deterrent to lawless police action. Indeed, all of the cases since *Wolf [v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949),] requiring the exclusion of illegal evidence have been based on the necessity for an effective deterrent to illegal police action. We cannot say that this purpose would be advanced by making the rule retrospective. *The misconduct of the police prior to Mapp has already occurred and will not be corrected by releasing the prisoners involved.*

*Linkletter*, 381 U.S. at 636–37, 85 S.Ct. at 1741–42 (citation omitted, emphasis added). The Court concluded *Mapp* was only to be

---

1. The majority treats *Cronk v. Intermountain Rural Electric Ass'n*, 765 P.2d 619 (Colo.App. 1988), as the relevant decision for retroactive application. Today's test includes a sixth prong that substantially changes *Cronk*. This change in the law was not clearly foreshadowed. Indeed, the majority cites no authority for requiring employer knowledge of an employee's reasonable belief that a refused order was illegal. *See* maj. op. at 109.

applied prospectively. *Id.* at 640, 85 S.Ct. at 1743.[2]

Here, the general purpose of the public-policy exception to at-will employment is to deter employers from using economic power to coerce employees to violate statutory law. The exception is primarily designed to benefit the public rather than employees. *See* Harrison, *The Price of the Public Policy Modification of the Terminable-at-Will Rule,* 34 Lab.L.J. 581, 581 (1983) (public-policy exception is designed to "counteract what can be termed the 'externalities' of the traditional terminable-at-will rule"). The purpose of the sixth prong is to limit frivolous litigation by discouraging an employee from bringing a public-policy wrongful discharge suit without proof that the defendant employer had actual or constructive knowledge that the employee refused to perform an order he reasonably believed to be illegal. Neither purpose would be furthered by applying today's decision to litigants asserting claims based upon conduct occurring prior to the announcement of this opinion. We may properly address the issue in this case, but to grant retrospective application of the law announced today to cases based on prior conduct would amount to judicial legislation. The misconduct of other parties has already occurred and cannot be corrected by retroactive application of the public-policy exception. The majority states that "the retroactive application of the public-policy exception will have the salutary effect of prohibiting an employer from discharging an employee for refusing to engage in conduct clearly illegal or detrimental to the public good." Maj. op. at 114. While this may be true, prospective application will have exactly the same effect without creating new claims where no cognizable claim existed before.

In evaluating the third factor in *Chevron,* whether retrospective application of the new rule could produce substantial inequitable results, I agree with the majority that it would not be inequitable to apply the public-policy exception to Lorenz's claim for relief. The fact that we apply today's rule to the case before us does not dispense with the necessity for the *Chevron* analysis of inequity. To be comprehensive, such a general inequity review must not be limited to a one-sided examination of the retroactive effect of a rule. We cannot be certain of the outcome of similar public-policy cases which are not before us. The majority predicts that application of the employer knowledge prong will "enure[ ] to the sole benefit of the employer." Maj. op. at 114. I question whether this inevitably will be the case. Consider, for example, a hypothetical case in which an employee has written a memorandum to her employer explaining that she refuses to obey orders on the basis that obeyance would violate statutory law. With such a declaration, the employee's case would be stronger rather than weaker under today's rule. What is relevant to *Chevron* is not which type of similarly situated party may benefit from retroactive application of a new rule, but rather whether similarly situated parties on either side would suffer inequitable detriment.

While the majority admits that the additional evidentiary requirement may result in "injustice or hardship" to employees, it declines to ascribe any retroactive significance to this supposed fact. *See* maj. op. at 114. In essence, the majority holds that the probability of inequity to employees is irrelevant. Under such a rule, the flexibility of the *Chevron* retroactivity analysis would be greatly diminished. Analysis would be limited to a one-sided equity appraisal. I would not endorse such a result. Without speculating on the effect today's rule may have on pending cases, it can surely be said that the public-policy exception enunciated today significantly changes

---

**2.** The *Linkletter* approach has been rejected in criminal law. New rules must be applied to all cases pending on direct review, *Griffith v. Kentucky,* 479 U.S. 314, 323, 328, 107 S.Ct. 708, 713, 716, 93 L.Ed.2d 649 (1987), but not necessarily to cases pending on collateral review, *Teague v. Lane,* 489 U.S. 288, 288, 310, 109 S.Ct. 1060, 1074, 103 L.Ed.2d 334 (1989) (plurality opinion) ("Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced.").

the evidentiary requirements for both plaintiffs and defendants in public-policy wrongful discharge cases. Depending on the facts of each case, there is a likelihood of serious adverse consequences to parties who have relied on the prior state of the law, whether we are speaking of employers who have made termination decisions or employees who have decided to bring wrongful discharge suits. Furthermore, retroactive application of the public-policy exception, by substantially changing the rules of the game, may result in added litigation expense for both parties. Prospective application would avoid such inequity. Application of the public-policy exception should be limited to cases based on conduct occurring after this opinion is announced. We have recognized the inequity of subjecting past conduct to a standard that did not exist at the time the conduct was engaged in. *See C.A.K.*, 652 P.2d at 608. Retrospective application of a rule that changes settled employment law may interfere with stability in an area "where society attaches particular importance to stability." *Id.; Ground Water Comm'n v. Shanks*, 658 P.2d 847, 849 (Colo.1983). I would conclude that the balance of the second and third *Chevron* factors tilts toward application of today's formulation of the public-policy exception to the at-will employment doctrine only to those employees whose wrongful discharge claims are based on facts occurring after the announcement of this opinion. Therefore, I respectfully dissent to retroactive application of the public-policy exception to the at-will employment doctrine.

I am authorized to say that Chief Justice ROVIRA and Justice VOLLACK join in this dissent.