**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 29, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

STANLEY C. MOWRY,

      Plaintiff-Appellant,

v.

UNITED PARCEL SERVICE, INC.,

      Defendant-Appellee.

No. 07-1197
(D.C. No. 03-CV-02307-RPM)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **LUCERO**, and **HARTZ**, Circuit Judges.

In this diversity case, Stanley C. Mowry appeals the district court's grant of

summary judgment to United Parcel Service, Inc. ("UPS") on his claim that UPS

wrongfully discharged him in violation of public policy, a tort recognized under

Colorado state law. Specifically, Mowry alleges that UPS supervisor Gregg Ford

terminated his employment because he pulled his commercial vehicle off the road

during adverse road and weather conditions, as required by federal and state

regulatory law. We agree with the district court that Mowry has failed to create a

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

genuine issue of material fact with respect to at least one element of the alleged tort: He has not advanced evidence that shows Ford knew, or reasonably should have known, at the time he terminated Mowry's employment that Mowry believed he was complying with federal or state safety regulations. Exercising jurisdiction under 28 U.S.C. § 1291, we therefore affirm the district court's grant of summary judgment to UPS.

**I**

For more than five years, Mowry worked as a full time "feeder driver" for UPS, and was responsible in that capacity for driving package trailers between UPS's hub in Commerce City, Colorado, and various package centers, including the center in Rawlins, Wyoming. Throughout the course of his employment at UPS, Mowry was a member of the International Brotherhood of Teamsters ("Teamsters" or "union"), and his employment was governed by a collective bargaining agreement ("CBA") between UPS and the Teamsters. The CBA provided that union employees could not be discharged in the absence of "just cause," which includes dishonesty. Like other UPS feeder drivers under union contract, Mowry was paid by the hour.

Mowry had a history of being disciplined for failing to comply with UPS polices and procedures. UPS had previously warned or suspended him for: failing to properly check the trailers he was pulling, attendance problems and irregularities in reporting his time, improperly removing an onboard computer

from his truck, violating Department of Transportation limitations on weekly maximum work hours, and failing to notify dispatch when he was delayed on routes. Mowry had also been terminated on at least one occasion, and lost his seniority on another, due to these performance problems. Each time, however, the sanctions imposed against him were reduced to suspensions through the union's grievance process. Relevant to this appeal, Mowry received a written warning memo in early October 2001 instructing him that "if [he] should ever find [him]self delayed for more than 15 minutes for any reason [he must] notify dispatch as to the reason immediately without exception." He was also warned that any failure to comply with that directive "may result in formal discipline at the appropriate level."

On the night of April 26 and the morning of April 27, 2002, Mowry drove his regular round-trip route between Commerce City, Colorado, and Rawlins, Wyoming. The feeder division manager at that time, Gregg Ford, suspected that Mowry was falsifying his time and trip records. Without Mowry's knowledge, Ford sent two UPS supervisors to follow Mowry on the trip. On the return leg of the journey, Mowry was pulling two empty tandem trailers back to Commerce City. At around 2:15 a.m., between Rawlins and Laramie, he encountered a wrecked semitrailer stretched across the interstate highway and maneuvered

around it.  Shortly thereafter, he stopped his truck at the Wagonhound rest area, where he remained for almost four hours.[1]

The parties dispute the reasons for Mowry's stop at Wagonhound. According to Mowry, he stopped because of inclement weather and the resulting hazardous road conditions.  Noting the jack-knifed truck just outside the rest area, he claims that wind, snow, ice, and heavy fog made it too dangerous to operate a semitrailer until conditions improved.  At the time he chose to stop, Mowry observed that there was black ice on the road, and that the rest area was full of other semitrailers.

Like all UPS trucks, the vehicle Mowry was driving that night was equipped with an onboard computer.  This device records such things as truck speeds and employee working hours, and allows drivers to report the status of their trip by entering predesignated codes.  Because the system did not have a code to indicate a stop based on impassable road conditions, Mowry entered a code for a "breakdown on road."  He did not, however, call the UPS dispatch office in Commerce City to report his delay, despite the requirement that he do so if he experienced any delay longer than 15 minutes, and despite the presence of a pay phone inside the Wagonhound rest area.[2]

---

[1] The Wagonhound rest area is located off of Interstate 80, approximately 50 miles west of Laramie, Wyoming.

[2] Mowry alleged that he was unaware of the pay phone and that, although he had a cellular phone on his person, he did not have cellular service at the rest

-4-

The UPS supervisors following Mowry, Rick Durante and Ron Blake (both former feeder drivers), each acknowledged during discovery that there was a jack-knifed truck just outside of the Wagonhound rest area, but stated that the weather was not severe enough to warrant pulling off the road. They further indicated that although the road was slushy and wet from a recent storm, other trucks were proceeding along the interstate highway in both directions at the time Mowry stopped, and that their own vehicle had no trouble driving behind Mowry's UPS semitrailer. The two supervisors concluded that Mowry was making an unauthorized stop. At approximately 6:00 a.m. that same morning, Mowry recommenced his return trip to Commerce City, arriving at the main UPS terminal around 9:00 a.m. on Saturday, April 27. No other employees were present, as the dispatch office was staffed only until 6:00 or 6:30 a.m. on Saturday mornings.

At some point before Mowry returned to work the following Monday, Ford reviewed Mowry's time card from the trip, which indicated that Mowry had arrived in Commerce City a few minutes after 9:00 a.m. and had checked out approximately 40 minutes later. Ford spoke with Durante and Blake, who relayed to him their observation that the road was passable when Mowry stopped at Wagonhound. He also reviewed the tachometer printout from the onboard computer in Mowry's truck. That report showed that Mowry traveled at normal

area. At the summary judgment stage of proceedings, we accept as true his version of the facts.

-5-

speeds—up to 70 miles per hour—for most of the return leg of the trip, including before and after his stop at Wagonhound. Ford further noted that Mowry had removed his timecard from the onboard computer two or three times during the trip, which prevented the system from capturing complete information about the journey, and that Mowry had entered the code "breakdown on road" for roughly the period of time he remained at the rest area. According to Ford, his review led him to conclude that Mowry had been dishonest in reporting the reasons for his stop and had stolen time from the company.[3] Because drivers are entitled to an unpaid one-hour meal break on each trip, and Mowry stopped for about 3 hours and 45 minutes, the time stolen was believed to be 2 hours and 45 minutes.

When Mowry returned to work the following Monday, Ford called him into his office at the beginning of the shift and discharged him for dishonesty. Ford did not question Mowry about the incident at Wagonhound. Nor did Mowry attempt to offer an explanation at the time Ford fired him. Later the same day,

---

[3] Ford had reason to believe that Mowry had acted similarly on at least one prior occasion. He had sent Durante to follow Mowry along the same route on April 22 to 23. On that night, Durante observed that Mowry stopped during his return trip to Commerce City at a highway-off ramp and turned his lights off for approximately three hours. Durante stated that the roads on the evening in question were clear, and that there was no obvious reason for the stop. Mowry did not call the dispatch office to advise of this delay, and reports from that trip indicate that Mowry entered the system code for "breakdown on road" for the period of time his truck was not moving. Mowry also did not report any mechanical problems or explain the delay to his supervisors when he returned to Commerce City. He reported all of the time from that trip, including the time he was stopped, as working time.

however, Mowry filed a grievance with the union, claiming that he had stopped at Wagonhound to wait out a storm that caused adverse road conditions, including high winds, fog, ice, and snow.

In accordance with the CBA, Mowry received a grievance hearing before a committee of union and management representatives. He rebutted the charge of dishonesty by alleging that he stopped at Wagonhound to avoid violating safety regulations that required him to cease operating a commercial vehicle in hazardous conditions. See 49 C.F.R. § 392.14 ("Extreme caution in the operation of a commercial motor vehicle shall be exercised when hazardous conditions . . . adversely affect visibility or traction. . . . If conditions become sufficiently dangerous, the operation of the commercial motor vehicle shall be discontinued . . . ."); see also 4 Colo. Code Regs. § 723-6 ¶ 6102(a)(I) (incorporating by reference 49 C.F.R. Part 392 as a Colorado state regulation). The grievance panel ultimately upheld Ford's decision to discharge Mowry for dishonesty.

Following the failure of his union appeal, Mowry filed suit against UPS in Colorado state court, challenging the termination of his employment on three separate grounds: (1) wrongful discharge in violation of public policy, (2) shorted wages, and (3) intentional infliction of emotional distress. With respect to the first claim, he again asserted that continuing his journey on the morning of April 27, 2002, would have caused him to violate safety regulations, and that he was therefore terminated in violation of public policy. UPS removed the suit to

federal court on diversity of citizenship grounds, and moved to have the case dismissed on the basis that Mowry's claims were preempted by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. The district court agreed and dismissed Mowry's claims.

On initial appeal to this court, we affirmed the district court's judgment in part and reversed in part. Mowry v. United Parcel Serv. ("Mowry I"), 415 F.3d 1149 (10th Cir. 2005). Specifically, we affirmed the dismissal of Mowry's claims based on shorted wages and intentional infliction of emotional distress, concluding that these claims were "inextricably intertwined" with the parties' CBA and thus preempted by § 301 of the LMRA. Id. at 1157-58. Applying the analysis articulated in Lingle v. Norge Division of Magic Chef, 486 U.S. 399 (1988), however, we reversed the district court's dismissal of Mowry's claim for wrongful discharge in violation of public policy, holding that it was not preempted by § 301. See Mowry I, 415 F.3d at 1152-57. The case was remanded for further proceedings consistent with our decision. Id. at 1158.

On remand, and after full discovery on Mowry's public policy claim, the district court granted summary judgment to UPS. It concluded that Mowry had failed to raise a genuine issue of material fact as to whether Ford was aware or should have been aware, at the time of his decision to terminate Mowry, that Mowry reasonably believed he was required to stop operating his semitrailer due to weather conditions. Mowry now timely appeals from that adverse decision.

-8-

## II

Mowry raises only one issue on appeal. He disputes the district court's conclusion that he failed to create a genuine issue of material fact on the question of whether Ford knew, or reasonably should have known, that Mowry believed he was required by law to cease driving his vehicle at Wagonhound. We review the district court's grant of summary judgment de novo, applying the same legal standard as the district court. MediaNews Group, Inc. v. McCarthey, 494 F.3d 1254, 1260 (10th Cir. 2007). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We construe the factual record, and all reasonable inferences derived therefrom, in the light most favorable to Mowry, the non-moving party. See Rost v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1119 (10th Cir. 2008). Because we are sitting in diversity, we apply the substantive law of the forum state. Meyers v. Ideal Basic Indus., Inc., 940 F.2d 1379, 1382 (10th Cir. 1991). There is no dispute that Colorado law governs in this case.

To avoid summary judgment on his claim of wrongful discharge in violation of public policy, Mowry was required to adduce sufficient evidence to create a genuine issue of material fact on each element of the tort. Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). In other words, his failure

to show a genuine dispute of material fact on any one of the necessary elements of his claim is fatal to his case.  Id.  In Martin Marietta Corp. v. Lorenz, 823 P.2d 100 (Colo. 1992), the Colorado Supreme Court first recognized the tort of wrongful discharge in violation of public policy, and outlined the four elements necessary for establishing such a claim.  It stated that to prove a prima facie case of this tort, an employee must show:

> [1] that the employer directed the employee to perform an illegal act as part of the employee's work related duties . . . ; [2] that the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen . . . ; [3] that the employee was terminated as the result of refusing to perform the act directed by the employer . . . ; [and] [4] that the employer was aware, or reasonably should have been aware, that the employee's refusal to comply with the employer's order or directive was based on the employee's reasonable belief that the action ordered by the employer was illegal . . . .

Id. at 109.

Mowry has failed to satisfy his burden at summary judgment of coming forward with any evidence in support of the fourth element.[4]  There is no evidence in the record demonstrating that Ford knew or should have known, at the time he terminated Mowry, that Mowry's decision to stop driving on the night in question was based on a reasonable belief that he would violate federal and state

---

[4] Because we resolve the issue on the fourth element of the claimed tort, we express no opinion on whether the factual record provides support for any of the remaining three elements.

regulations by continuing his journey.[5] See id. at 110 (requiring that an employer receive "fair notice, prior to the discharge decision, of circumstances supportive of the employee's reasonable belief that the action directed by the employer" violates public policy (emphasis added)).

## A

We begin with the question of Ford's actual knowledge. Durante and Blake reported to Ford that they did not consider the road conditions to be hazardous. Rather, they stated that the road was merely slushy and wet and that traffic was

---

[5] UPS argues that we may affirm the district court on the alternative basis that Mowry, a union employee protected from termination by the provisions of the CBA, has no cause of action for public policy discharge under Colorado law. UPS contends that because the Colorado Supreme Court has referred to this tort as an "exception" to the general rule that Colorado employees are employed at will, see Lorenz, 823 P.2d at 104 (Colo. 1992), that court has restricted the availability of the tort to at-will employees. Mowry counters that the court has never explicitly denied the cause of action to a union employee, and likely would not do so, and that in any event we implicitly decided this question in his favor in Mowry I.

Our duty as a federal court sitting in diversity is generally to predict how the state supreme court would rule on an unsettled question of state law presented to us. See, e.g., Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003). Because Mowry's claim would fail even if the Colorado Supreme Court extended the tort to cover employees protected from termination by a CBA, however, we need not decide the question urged upon us by UPS. Moreover, we note that we did not settle this question in Mowry I, where we reached only the issue of whether Mowry's claims were preempted. 415 F.3d at 1150, 1157. Our decision did not require us to address—by implication or otherwise—the subsidiary question of whether a union employee such as Mowry can properly assert a cause of action under the tort at issue. See id. at 1152-57.

-11-

flowing normally in both directions at the time Mowry stopped.[6] Furthermore, the tachometer report of the trip indicated that, rather than slowing down in response to increasingly adverse conditions, Mowry's truck maintained a relatively constant speed before and after the stop. Specifically, the report showed that the truck had traveled at an average speed of 55 to 65 miles per hour both before and after the stop at Wagonhound, that Mowry passed the accident near Wagonhound at a fairly rapid rate of speed, and that his truck reached speeds of 70 miles per hour following his departure from the rest area. Mowry also did not call the dispatch office to explain the delay, either at the time he experienced the delay or once he resumed his journey. Ford thus had no actual knowledge of the reason for Mowry's stop.

Mowry does not dispute these facts. To be sure, he admitted that nobody at UPS was actually aware at the time of his termination that he stopped at Wagonhound due to hazardous weather conditions. He simply had not told anyone of the incident before Ford fired him. Mowry does, however, advance a legal argument in support of his actual knowledge contention. He encourages us to impute Durante and Blake's alleged knowledge of the adverse road conditions—and thus knowledge of Mowry's reasonable belief that continuing to drive would have been unlawful—to UPS as a whole. Because those supervisors

_____

[6] Accepting, as we must, Mowry's description of the road conditions, we nonetheless recognize that there is no dispute in the record that Durante and Blake reported to Ford that the road was passable and merely slushy.

-12-

observed the same hazardous road conditions that Mowry did, and because we must accept his description of those road conditions at the summary judgment stage, he argues that UPS knew the road was dangerous. But in advancing this argument, Mowry fails to cite any authority from the Colorado courts indicating that the knowledge element of a <u>Lorenz</u> tort can be satisfied by the knowledge of the corporation as a whole, rather than that of the individual decisionmaker who made the termination decision. The only case he does cite in support of his legal contention—a federal trademark case—merely sets forth the general principle of agency law that a corporation is charged with the knowledge of its employees. See <u>W. Diversified Servs., Inc. v. Hyundai Motor Am., Inc.</u>, 427 F.3d 1269, 1276 (10th Cir. 2005). As we view the matter, the dearth of authority presented, particularly applicable state authority, demonstrates "either that there is no authority to sustain [Mowry's] position or that [he] expects the court to do [his] research." <u>Rapid Transit Lines, Inc. v. Wichita Developers, Inc.</u>, 435 F.2d 850, 852 (10th Cir. 1970). Given that there is precedent in related contexts that appears to be contrary to his position, we decline to countenance his inadequately developed argument. <u>See, e.g.</u>, <u>Campbell v. Gambro Healthcare, Inc.</u>, 478 F.3d 1282, 1290 (10th Cir. 2007) (refusing to impute a subordinate's alleged retaliatory intent to a decisionmaker in evaluating whether the plaintiff had created a genuine issue of material fact on the existence of a casual connection between the plaintiff's attempted exercise of FMLA rights and the

decisionmaker's termination of the plaintiff's employment); see also Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1231-32 (10th Cir. 2000).

**B**

Failing to discern any genuine issue of material fact as to whether Ford had actual knowledge of Mowry's claim, we next consider whether Mowry has shown that Ford should have known that Mowry reasonably believed he was required by law to stop. Mowry urges that Ford should have known of the adverse conditions because he reviewed the data from the onboard computer in Mowry's truck, which indicated that Mowry had input the code "breakdown on road." We conclude, however, that neither this piece of information, nor any of the other information available to Ford prior to Mowry's termination, sufficiently suggested adverse road conditions such that Ford should have been aware that Mowry reasonably believed that he was legally obligated to stop his vehicle.

Four undisputed facts are instructive. First, the tachometer report from Mowry's truck showed that Mowry maintained normal travel speeds both before and after he stopped at Wagonhound. This provides an objective inference that the road conditions did not prevent driving at normal speeds. Second, although the two supervisors told Ford that there was a jack-knifed semitrailer on the interstate immediately before Mowry stopped, they did not state that the accident was caused by the weather or hazardous road conditions. In fact, both supervisors indicated that Mowry was able to move around the accident with relative ease.

-14-

Third, the code "breakdown on road" was not sufficient to allow Ford to deduce that Mowry stopped due to adverse road conditions. Any number of reasons—legitimate or otherwise—could have prompted Mowry to enter the code, and Ford would therefore have been unable to determine that Mowry stopped due to hazardous roads by virtue of that code alone. Finally, Mowry never called to notify UPS dispatch that he was going to be delayed, as Ford would reasonably have expected him to do if he encountered bad weather—particularly because Mowry had received a written notice instructing him to report such delays "without exception." Ford consequently had no reason to be aware that Mowry was delayed as a result of hazardous road conditions.

## C

Mowry raises a final argument based on policy. He contends that UPS should not have been able to terminate his employment before providing him with an opportunity to explain his actions. On this score, Mowry reasons that because Ford allegedly failed to give him an occasion to convey the reasons for which he stopped, and because he was not aware that Ford was considering firing him, it would be manifestly unjust to leave him without a remedy on the basis that Ford was not aware of his protected actions. To do so, he claims, would allow employers such as UPS to avoid liability for the tort of wrongful discharge in violation of public policy by virtue of ignorance alone.

-15-

Mowry's argument is neither consistent with the Colorado Supreme Court's decision in Lorenz, nor with the facts presented in this case. In Lorenz, the court unambiguously recognized that the cause of action at issue is not available unless the employer was aware or should have been aware of the protected action prior to its decision to terminate the employee. Two primary rationales guided the court in imposing this requirement. First, the element is designed to provide an "employer with a fair opportunity to distinguish between the conscientious employee concerned about the legality of particular conduct demanded by the employer and the employee that refuses to carry out an order or directive . . . out of insubordination or some improper motive." Id. at 110 (emphasis added). Second, the knowledge element "provide[s] the employer with fair notice, prior to the discharge decision, of circumstances supportive of the employee's reasonable belief that the action directed by the employer would be manifestly illegal, [or] would be contrary to the employee's duty as a citizen . . . ." Id. (emphasis added). Were Mowry's argument accepted as a matter of law, it would undercut these twin rationales by allowing a cause of action to proceed even where an employer lacked the essential fair notice and fair opportunity to make an appropriate employment decision. That is not the law of Colorado.

The contention advanced is also belied by the undisputed facts. Viewing the evidence in the light most favorable to Mowry, it is undisputed that he had a cellular phone on the night in question, and that UPS policy required him to

-16-

report any delay in his route of greater than 15 minutes "<u>without exception</u>." Mowry simply never availed himself of the opportunity to report his delay. Although Mowry asserts that his cellular phone had no reception at Wagonhound, he does not dispute that he could have used his cellular phone after he resumed his journey at 6:00 a.m. to call the dispatch office or, at a minimum, leave a message explaining why he was delayed. He also could have taken other steps to inform UPS of his delay and the reasons for it, including by reporting the incident in written form when he returned to Commerce City on the morning of April 27, or by otherwise seeking out a pay phone at some point during the return trip. But the record unambiguously reveals that he did not attempt to inform Ford, or anyone at UPS, of his reasons for the stop prior to his discharge. In short, Mowry's argument that he never had an opportunity to explain why he stopped on the night in question is contradicted by the undisputed facts in the record.

## III

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

ENTERED FOR THE COURT

Carlos F. Lucero
Circuit Judge