FILED
United States Court of Appeals
Tenth Circuit

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

February 18, 2022

Christopher M. Wolpert
Clerk of Court

_____

NICOLAS DONEZ,

    Plaintiff - Appellant

v.

LEPRINO FOODS, INC.,

    Defendant - Appellee.

No. 21-1212
(D.C. No. 1:19-CV-00285-CMA-NRN)
(D. Colo.)

_____

### ORDER AND JUDGMENT[*]
_____

Before **MATHESON**, **EBEL**, and **PHILLIPS**, Circuit Judges.
_____

Nicolas Donez worked as a foreperson for Leprino Foods ("Leprino"). On February 9, 2016, Frank Levar, another Leprino employee, pushed Mr. Donez, who pushed Mr. Levar in response. Mr. Levar then knocked Mr. Donez unconscious. Leprino fired both employees.

Mr. Donez sued. He alleged Leprino fired him based on (1) exercising his right to self-defense in violation of Colorado law and (2) his race in violation of Title VII of the Civil Rights Act. The district court granted summary judgment for Leprino.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

# I.  BACKGROUND

## A. *Factual History*

"We present the facts in the light most favorable to [Mr. Donez], drawing all reasonable inferences in his favor."  *Donahue v. Wihongi*, 948 F.3d 1177, 1183 (10th Cir. 2020).

### 1. **The Physical Altercation Between Mr. Donez and Mr. Levar**

Mr. Donez is Hispanic.  He was an at-will employee at Leprino, which manufactures cheese in Fort Morgan, Colorado.  Mr. Donez was a foreperson in the Whey Department.  On February 9, 2016, the supervisor of the Whey Department was out sick, leaving Mr. Donez "in charge of that department as a supervisor and as a foreman."  App., Vol. I at 128-29.  During his shift, Mr. Donez's verbal disagreement with Mr. Levar led to a physical altercation in which Mr. Levar first pushed Mr. Donez.  Mr. Donez pushed Mr. Levar in response.  Mr. Levar then knocked Mr. Donez unconscious, sending him to the hospital.[1]  Mr. Donez suffered "an injury around the neck area and the back of the head."  App., Vol. II at 419.

A few hours later, Leprino human resources ("HR") personnel Risa Esterly-Wessbecker and Julia Lambert traveled to the hospital and spoke with Mr. Donez.  He told Ms. Esterly-Wessbecker "[t]hat [Mr. Levar] pushed him, punched him.  And he could not recall anything else."  Suppl. App., Vol. I at 53.  Mr. Donez also provided

---

[1] On February 11, 2016, Leprino fired Mr. Levar after he admitted to Leprino HR personnel that he punched Mr. Donez.  The letter firing Mr. Levar explained that Leprino "ha[d] zero tolerance for workplace violence."  App., Vol. III at 621.

Leprino with a written statement dated February 10, 2016. It explained that after the verbal argument, Mr. Levar "became aggressive, pushed me in my chest. Then everything went black." *Id.* at 69.

Detective Steve Vosburg of the Fort Morgan Police Department ("FMPD") also interviewed Mr. Donez at the hospital on February 9. Mr. Donez told the detective that he and Mr. Levar "were arguing and he remembered [Mr. Levar] pushing and when [Mr. Levar] pushed him, [Mr. Donez] pushed him back." App., Vol. II at 420-21. Detective Vosburg spoke to Ms. Esterly-Wessbecker on February 10, 2016, and relayed Mr. Donez's statement to her. Suppl. App., Doc. 10867614 ("Audio Recording 3"); Suppl. App., Vol. I at 56.

On February 22, Kelly Soja, a Leprino HR official, wrote an email to Ms. Lambert, asking, "Did we get the police reports, detective's statements on his conversation with [Mr. Donez], etc? We need those ASAP if we have not." App., Vol. II at 438. A few minutes later, Ms. Soja again emailed Ms. Lambert, stating, "If we don't get that detective's statement on what [Mr. Donez] said to him, we probably can't term him." *Id.* at 437.

Upon receiving a copy of the FMPD police report, which stated that Mr. Donez admitted to pushing Mr. Levar, Ms. Esterly-Wessbecker called Mr. Donez to confirm this fact. Mr. Donez told Ms. Esterly-Wessbecker that "he remembered when he spoke to the police officer that he did state that he had shoved [Mr. Levar]." App., Vol. I at 92.

On February 29, Ms. Esterly-Wessbecker met with Mr. Donez and terminated his employment. Mr. Donez then told Ms. Esterly-Wessbecker he had pushed Mr. Levar in

3

self-defense.  This was the first time Mr. Donez claimed self-defense to anyone at

Leprino.  *Id.* at 75; Suppl. App., Vol. II at 205.[2]  According to Mr. Donez, Ms. Esterly-

Wessbecker explained "that it didn't matter" if he was acting in self-defense.  App., Vol.

I at 75.  Ms. Esterly-Wessbecker gave Mr. Donez a letter stating that Leprino was firing

him because "[d]uring our investigation you verbally admitted to us you pushed [Mr.

Levar].  Leprino Foods Company has no tolerance for workplace violence."  App., Vol.

III at 620.

2.  **Comparators**

To support his Title VII claim, Mr. Donez relied on evidence purportedly

demonstrating that Leprino disciplined him and other Hispanic employees more harshly

than non-minority employees who engaged in similar conduct.[3]  His comparators were:

- **Frank Levar**, a White employee, was involved in a 2010 or 2011 altercation with co-worker Shane Tucker during which the men had a verbal dispute and Mr. Levar pushed Mr. Tucker.  Leprino HR personnel Shane Cole and Don Northrup handled the incident.  Mr. Levar was not disciplined.

---

[2] Leprino contends Mr. Donez did not claim self-defense at this meeting.  Aplee. Br. at 10 n.3.  The part of the record it cites in support of this argument, however, does not say this.  *See* App., Vol. I at 92.  Regardless, because we view the facts in the light most favorable to Mr. Donez, we treat as true that Mr. Donez told Ms. Esterly-Wessbecker he was acting in self-defense.

[3] Before the district court, Mr. Donez submitted evidence of "8 workplace incidents involving 6 [Leprino] employees between 2007 and 2018" to support his Title VII claim.  App., Vol. III at 549.  On appeal, though he mentions all eight incidents, he argues only that "Leprino's disciple [sic] of Mr. Levar, Mr. Morrison and termination of Ms. Campos should have been admitted because the a [sic] reasonable comparators."  Aplt. Br. at 13.  He has therefore abandoned any argument that the other three employees were suitable comparators, and we do not discuss them here.  *See Stender v. Archstone-Smith Operating Tr.*, 910 F.3d 1107, 1117 (10th Cir. 2018).

- **Shawn Morrison**, a White employee, was accused of "rough-housing" and inappropriate touching on two occasions in March and April 2016.  In March, a Leprino employee complained to Ms. Lambert that he was "tired of [Mr. Morrison] rough-housing, grabbing shoulders, pretend[ing]to choke hold, playing around."  Suppl. App., Vol. II at 218.  Then in April, a Leprino employee reported Mr. Morrison for picking up a female employee and "cupp[ing] her rear end with his hand."  App., Vol. I at 104-05.  Ms. Soja and Ms. Lambert responded to the incident, and Ms. Lambert issued Mr. Morrison a "last and final warning," stating that "any further performance issues within a 12-month period [] you will be subject to immediate termination."  App., Vol. II at 538.

- **Crystal Campos**, an Hispanic employee, kicked a co-worker during an incident in June of 2017.  Ms. Lambert fired Ms. Campos.

## B. *Procedural History*

The district court issued orders (1) granting in part and denying in part Leprino's motion for summary judgment (the "First Summary Judgment Order"), (2) excluding Mr. Donez's comparator evidence, and (3) granting Leprino's renewed motion for summary judgment ("the Second Summary Judgment Order").

### 1. **First Summary Judgment Order**

The First Summary Judgment Order dismissed Mr. Donez's state law wrongful termination claim but allowed his Title VII discrimination claim to go forward.

#### a. *Wrongful termination in violation of public policy*

Mr. Donez alleged that Leprino violated public policy by firing him for asserting his rights to (1) self-defense and (2) receive workers' compensation benefits.  The district court concluded that Mr. Donez had failed to demonstrate that employees have a "job-related right" to act in self-defense under Colorado law.  App., Vol. II at 530-33.  It further held that the workers' compensation claim failed because Mr. Donez had not

provided evidence establishing a causal connection between the exercise of his workers'

compensation rights and his termination.[4]

      b.  *Title VII—discrimination*

The district court determined that two factual issues precluded summary judgment

on Mr. Donez's Title VII claim.  First, it said there were genuine issues of material fact as

to whether Mr. Donez established, via comparator evidence, that he was treated less

favorably than similarly situated, non-minority employees.  Second, the court determined

there was a genuine factual dispute as to whether Leprino's reason for firing Mr.

Donez—that he pushed Mr. Levar—was pretextual because there was evidence from

which a rational jury could find that (1) Leprino decided to fire Mr. Donez and then

sought a rationale to justify its action, and (2) Mr. Donez "was the victim of an attack and

not a willing participant in a fight."  *Id.* at 524.

2.  **Motion in Limine**

The parties then filed cross-motions in limine, which the district court granted in

part and denied in part.  As relevant here, the court excluded Mr. Donez's comparator

evidence, reasoning that the comparators were not similarly situated to Mr. Donez, and

evidence related to their misconduct was therefore not relevant to establishing a Title VII

violation.  The court explained:

- Mr. Levar's 2010/2011 incident was not relevant to pretext because it
  occurred "too long before Mr. Donez's firing in February 2016."  App.,
  Vol. III at 551.

---

[4] Mr. Donez has abandoned his workers' compensation argument on appeal.  *See Scarlett v. Air Methods Corp.*, 922 F.3d 1053, 1067 (10th Cir. 2019).

- Mr. Morrison's 2016 incidents were not relevant to pretext because (1) Mr. Morrison was disciplined for violating Leprino's "policy against workplace horseplay," whereas Mr. Donez was fired for violating the company's Workplace Security Policy; (2) different HR personnel disciplined them; and (3) Mr. Morrison was not a supervisor, and Mr. Donez was. *Id.* at 551-52.
- Ms. Campos's 2017 incident "occurred too long after Mr. Donez's firing to be relevant to a showing of pretext." *Id.* at 551.

3. **Second Summary Judgment Order**

Leprino next filed a renewed motion for summary judgment. The district court granted the renewed motion, concluding that without the now-excluded comparator evidence, Mr. Donez could not establish a prima facie case for employment discrimination because his remaining evidence was "insufficient to give a rise to an inference of discrimination." App., Vol. III at 633.[5]

## II.  DISCUSSION

We review a district court's grant of summary judgment de novo, applying the same standards as the district court under Federal Rule of Civil Procedure 56(a). *Jordan v. Maxim Healthcare Servs., Inc.*, 950 F.3d 724, 730 (10th Cir. 2020). We draw all reasonable inferences and resolve factual disputes in favor of Mr. Donez. *Id.* We will affirm "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

---

[5] Although the district court excluded the comparator evidence after deciding it was not relevant to proving <u>pretext</u>, it ultimately granted Leprino's renewed motion for summary judgment because Mr. Donez could not establish a <u>prima facie case of discrimination</u>.

We first address the district court's grant of summary judgment for Leprino on the wrongful termination claim and then turn to the Title VII discrimination claim.

### A. *Mr. Donez's Wrongful Termination Claim*

We affirm the grant of summary judgment in favor of Leprino on Mr. Donez's wrongful termination claim. When Leprino fired Mr. Donez, an at-will employee, it was unaware that he claimed to have pushed Mr. Levar in self-defense. Leprino therefore could not have fired him for exercising a purported right to self-defense.[6]

### 1. Legal Background

Under Colorado law, an employer may fire an at-will employee without cause unless the plaintiff-employee can establish the termination violated public policy. *Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 523 (Colo. 1996). To establish a public policy exception, the plaintiff must show:

(1) the employer directed the employee to perform an illegal act as part of the employee's work-related duties or prohibited the employee from performing a public duty or exercising an important job-related right or privilege;

(2) the action directed by the employer would violate a specific statute related to public health, safety, or welfare, or would undermine a clearly expressed policy relating to the employee's basic responsibility as a citizen or the employee's right or privilege as a worker;

(3) the employee was terminated as the result of refusing to perform the act directed by the employer; and

(4) the employer was aware that the employee's refusal to perform the act was based on the employee's reasonable belief that the directed act was unlawful.

---

[6] Though the district court resolved the case on a different basis, "we may *affirm* on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented to us on appeal." *Hayes v. SkyWest Airlines, Inc.*, 12 F.4th 1186, 1201 (10th Cir. 2021) (quotations omitted).

*Bonidy v. Vail Valley Ctr. for Aesthetic Dentistry, P.C.*, 232 P.3d 277, 281 (Colo. App. 2010) (citing *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 109 (Colo. 1992)) (spacing added).

For a public policy to be the basis for a wrongful termination claim, it "must serve the public interest and be sufficiently concrete to notify employers and employees of the behavior it requires." *Mariani*, 916 P.2d at 525. "Not all potential sources of public policy are of sufficient gravity to outweigh the precepts of at-will employment. . . . The General Assembly is the branch of government charged with creating public policies, and the courts may only recognize and enforce such policies." *Crawford Rehab. Servs., Inc. v. Weissman*, 938 P.2d 540, 553 (Colo. 1997).

The Colorado Supreme Court has "unambiguously recognized that the cause of action [for wrongful termination] is not available unless the employer was aware or should have been aware of the protected action prior to its decision to terminate the employee." *Mowry v. United Parcel Serv., Inc.*, 280 F. App'x 702, 710 (10th Cir. 2008) (unpublished) (citing *Lorenz*, 823 P.2d at 110);[7] *see also Barlow v. C.R. England, Inc.*, 703 F.3d 497, 507-09 (10th Cir. 2012) (to establish a prima facie case of wrongful termination, plaintiff must demonstrate causation—i.e., that he was fired for engaging in protected activity).

---

[7] We cite this unpublished decision only for its persuasive value. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1.(A).

9

2. **Analysis**

Mr. Donez argues that he was fired in violation of "a well-established public policy for all individuals, including employees, to defend[] themselves." Aplt. Br. at 16. Thus, he contends, the district court erred in granting summary judgment to Leprino on his claim for wrongful termination.

The Colorado Supreme Court has not recognized a job-related right to self-defense. We need not predict whether it would do so here because Mr. Donez has not established that Leprino knew he claimed self-defense when it decided to fire him. His wrongful termination claim therefore fails.

The record shows Mr. Donez did not inform anyone at Leprino that he pushed Mr. Levar in self-defense until after Ms. Esterly-Wessbecker gave him the termination letter. *See* App., Vol. I at 75; Suppl. App., Vol. II at 205. To show wrongful termination in violation of public policy, Mr. Donez must establish that Leprino "was aware or should have been aware of the protected action prior to its decision to terminate [him]." *Mowry*, 280 F. App'x at 710 (citing *Lorenz*, 823 P.2d at 109-110). Because Leprino decided to fire Mr. Donez before it knew, or should have known, that he claimed to have pushed Mr. Levar in self-defense, it could not have fired him for acting in self-defense. Even if Colorado would recognize self-defense as a public policy protection against at-will termination, Mr. Donez has thus failed to establish causation—that he was fired due to exercise of an established public policy interest—a necessary element of a prima facie case of wrongful termination. *See Bonidy*, 232 P.3d at 281.

10

Our decisions about federal retaliation claims reinforce this conclusion.  For example, in *Sabourin v. University of Utah*, the plaintiff alleged his employer fired him for "going over [his supervisor's] head to obtain" leave under the Family and Medical Leave Act.  676 F.3d 950, 958 (10th Cir. 2012).  We affirmed summary judgment for the employer, explaining "the uncontradicted evidence show[ed] that [the supervisor] decided to lay off [plaintiff] *before* she learned that he might take FMLA leave."  *Id.*  The retaliation claim therefore failed because "there was no causal connection between the protected activity (the request for FMLA leave) and the adverse action (the reduction in force)."  *Id.* at 959 (quotations and alterations omitted); *see also Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1226 (10th Cir. 2016).

Mr. Donez offers two arguments as to why he established a prima facie case of wrongful termination despite not telling Leprino he was acting in self-defense until after it decided to fire him.  Neither is persuasive.

First, he contends Leprino's investigation was inadequate because it allowed the company to remain willfully ignorant of the fact he was acting in self-defense.  In support, Mr. Donez points out that "Leprino never asked [] if he was acting in self-defense."  Aplt. Reply Br. at 5.  But based on the record, no reasonable juror would conclude Leprino's investigation was inadequate.  Leprino (1) interviewed Mr. Donez at the hospital; (2) solicited a written statement from him; (3) relied on the police report, which incorporated information from Detective Vosburg's interview with Mr. Donez and other Leprino employees; (4) called Mr. Donez to confirm facts in the police report; and (5) interviewed employees or requested statements from them regarding the altercation.

11

Second, Mr. Donez argues that Leprino knew he was acting in self-defense given that (1) the police report and a report Leprino submitted to OSHA referred to Mr. Donez as "the victim," (2) Mr. Levar admitted to assaulting Mr. Donez, and (3) Mr. Levar was arrested for his role in the incident while Mr. Donez was not. But none of this evidence sheds light on Mr. Donez's reason for pushing Mr. Levar.

The OSHA report refers to Mr. Donez as "the victim," but Leprino did not use this language—it was a default term on the OSHA form. *See* App., Vol. III at 622-23. Notably, the section of the form containing Leprino's explanation of the altercation refers to Mr. Donez as "[t]he injured" and not "the victim." *Id.* at 622. And one of the statements in the police report referring to Mr. Donez as "the victim" was made before law enforcement even knew Mr. Donez had pushed Mr. Levar, indicating that FMPD personnel used the term for reasons other than describing Mr. Donez's role in the fight or his motivation for pushing Mr. Levar. *See* App., Vol. II at 417.

Nor can we conclude Leprino knew Mr. Donez was acting in self-defense based on Mr. Levar's description of the fight or that only Mr. Levar was arrested. Although Mr. Levar told several employees that he "hit" or "knocked out" Mr. Donez, *id.* at 399, 410, such statements, along with his arrest, do not reveal Mr. Donez's role in the dispute. And there is no evidence that Leprino knew Mr. Donez would not be charged when it decided to fire him.

Finally, Mr. Donez's statements regarding the incident indicate that Mr. Levar stopped acting as the aggressor after he initially pushed Mr. Donez. App., Vol. I at 74.

Leprino, which relied on those statements, thus had no reason to believe Mr. Donez was defending himself when he pushed Mr. Levar.

\*     \*     \*     \*

Mr. Donez has not established that, when Leprino decided to fire him, it knew or should have known he claimed to be acting in self-defense when he pushed Mr. Levar. Thus, even assuming the Colorado Supreme Court were to recognize a job-related right to self-defense, something it has yet to do, his claim would still fail. We affirm the district court's grant of summary judgment in favor of Leprino on Mr. Donez's wrongful termination claim.

### B.  *Mr. Donez's Discrimination Claim*

We affirm the district court's grant of summary judgment on Mr. Donez's discrimination claim. We do not decide whether the district court (1) abused its discretion in excluding Mr. Donez's comparator evidence or (2) erred in determining that the remaining evidence failed to establish a prima facie case of discrimination. Rather, we assume Mr. Donez's comparator evidence was admissible but conclude based on all the evidence that Mr. Donez has not established pretext.[8]

### 1.  **Legal Background**

"Title VII of the Civil Rights Act of 1964 . . . prohibits employment discrimination on the basis of race, color, religion, sex, or national origin." *Ricci v.*

---

[8] We therefore affirm the district court on this claim but do so on an alternate basis. *Hayes*, 12 F.4th at 1201.

*DeStefano*, 557 U.S. 557, 577 (2009).  Employers cannot discriminate "in hiring, firing, salary structure, promotion and the like."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 342 (2013).

    a.  McDonnell Douglas *framework*

Because Mr. Donez does not present direct evidence of discrimination, we apply the *McDonnell Douglas* burden-shifting framework to his Title VII claim.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *see also Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 884 (10th Cir. 2018).  Under this framework, Mr. Donez first must establish a prima facie case of discrimination by showing that "(1) [he] belongs to a protected class; (2) [he] suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination."  *E.E.O.C. v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007).  Once he makes this showing, "the burden shifts to [Leprino] to articulate a legitimate, nondiscriminatory reason for the adverse action."  *Id.*  If Leprino does this, the burden shifts back to Mr. Donez, who must "show that there is a genuine issue of material fact as to whether the employer's proffered reasons are pretextual."  *Id.*

    b.  *Pretext*

In evaluating whether a plaintiff has established pretext, "we are obliged to consider [the] evidence in its totality."  *Orr v. City of Albuquerque*, 531 F.3d 1210, 1215 (10th Cir. 2008).  The burden of establishing pretext "is more demanding [than the burden of establishing a prima facie case] and requires a plaintiff to assume the normal

burden of any plaintiff to prove his or her case at trial." *Lobato v. New Mexico Env't Dep't*, 733 F.3d 1283, 1293 (10th Cir. 2013) (quotations omitted).

"A plaintiff can establish pretext by showing the defendant's proffered nondiscriminatory . . . explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude they are unworthy of belief." *Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017) (quotations and alterations omitted).  But "[e]vidence that the employer should not have made the adverse employment decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility." *Id.* (quotations and alterations omitted).

"[A] plaintiff may [] show pretext on a theory of disparate treatment by providing evidence that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000).  A similarly-situated employee "shares the same supervisor, is subject to the same standards governing performance evaluation and discipline, and has similar relevant employment circumstances, such as work history." *Hiatt*, 858 F.3d at 1318.

2.  **Analysis**

Mr. Donez's comparator evidence and his other circumstantial evidence do not establish pretext.  First, of his three alleged comparators, Mr. Donez was not similarly situated to two of them, and any similarity with the third is not enough to show pretext. Second, Mr. Donez's other circumstantial evidence—Ms. Soja's emails inquiring about

15

the police report and Leprino's investigatory procedures—shows that Leprino fired Mr. Donez for pushing Mr. Levar and does not establish pretext.

  a. *Comparator evidence*

    i. <u>Mr. Levar</u>

Mr. Donez contends he was similarly situated to Mr. Levar when the latter pushed a co-worker during a dispute in 2010 or 2011 but was not disciplined. Mr. Levar and Mr. Donez were not similarly situated regarding that incident. But they were as to their joint involvement in the 2016 altercation.

    1) 2010/2011 incident

Mr. Levar's 2010/2011 incident does not supply competent comparator evidence.

<u>First</u>, the HR decisionmakers who handled Mr. Levar's 2010/2011 incident—Mr. Cole and Mr. Northrup—were not involved in the 2016 decision to fire Mr. Donez. HR officials Ms. Esterly-Wessbecker, Ms. Soja, and Ms. Lambert were involved in that decision. This distinction renders Mr. Levar an unsuitable comparator because generally, to be similarly situated, the plaintiff and the comparator must "share a supervisor or decision-maker." *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021); *see also Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 922 (10th Cir. 2004) ("Comparison of one disciplinary action with another ordinarily is relevant only to show the bias of the person who decided upon the disciplinary action."). Because

different decisionmakers handled the incidents, Mr. Levar in 2010/2011 and Mr. Donez in 2016 were not similarly situated.[9]

Second, Mr. Levar's 2010/2011 incident occurred roughly five years before the 2016 altercation and is too remote to demonstrate pretext. As we have explained, comparator evidence involving temporally remote events has diminished probative value because "[e]mployers' disciplinary practices necessarily change over time." *Kendrick*, 220 F.3d at 1233-34. We have explained, for example, that an incident that occurred two years before the plaintiff's firing had "diminishe[d]" evidentiary value. *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1115 n.3 (10th Cir. 2007). Given the roughly five-year span between the 2010/2011 incident and the 2016 altercation, we cannot say Mr. Levar and Mr. Donez were similarly situated.

### 2) 2016 incident

In 2016, Leprino treated Mr. Levar and Mr. Donez the same—it fired both of them. This undermines Mr. Donez's pretext argument. *See English v. Colorado Dep't of Corr.*, 248 F.3d 1002, 1012 (10th Cir. 2001) ("A plaintiff can not [sic] pick and choose a person he perceives is a valid comparator who was allegedly treated more favorably, and completely ignore a significant group of comparators who were treated equally or less

---

[9] Mr. Donez argues he need not share the same supervisor as Mr. Levar where, as here, he "claims to be a victim of a company-wide discriminatory policy." Aplt. Br. at 26. Though he points to instances where Hispanic and non-Hispanic employees received different discipline for allegedly similar infractions, he does not explain how those employees were similarly situated. Mr. Donez has therefore not provided evidence that Leprino had a company-wide discriminatory policy.

favorably than he." (quotations and alterations omitted)).  Indeed, out of all the

comparators, Mr. Donez was most similar to Mr. Levar with respect to the 2016

altercation:  (1) their misconduct occurred at the exact same time; (2) though Mr. Levar

was more aggressive, both men were involved in the same physical altercation; and

(3) the same decisionmakers disciplined them.  Leprino fired both shortly after receiving

confirmation of their participation in the fight.  This evidence supports Leprino's position

that it fired both men for engaging in violent physical conduct, a clear violation of the

company's Workplace Security Policy.

### ii.  Mr. Morrison

Mr. Donez also argues he was similarly situated to Mr. Morrison, who engaged in

misconduct in March 2016 and again in April but was not fired.  Mr. Donez and Mr.

Morrison were not similarly situated as to the March incident.  The question is closer

with respect to the April 2016 incident.

### 1)  March 2016 incident

In March 2016, Jay Marshall, a Leprino employee, told HR personnel "he was

tired of [Mr. Morrison's] rough-housing, grabbing shoulders, pretend[ing] to choke hold,

playing around.  He stated he wanted it to stop.  We are here to work and not play

around."  Suppl. App., Vol. II at 218.

Mr. Donez and Mr. Morrison were not similarly situated because their conduct

was not "of comparable seriousness."  *PVNF*, 487 F.3d at 801.  Although both made

physical contact with co-workers, that contact was qualitatively different.  Mr.

Morrison's behavior was accurately characterized as horseplay; indeed, the colleague

18

who complained described it as "playing around." Suppl. App., Vol. II at 218. By

contrast, Mr. Donez pushed a coworker in a physical altercation that led to Mr. Levar's

arrest and Mr. Donez's hospitalization.

2) April 2016 incident

In early April 2016, Mr. Morrison was "seen picking up another employee around

the waist," *id.* at 221, and "cupping [her] rear end," App., Vol. I at 105. An employee

who witnessed the incident reported it to HR and later characterized it as "horseplay plus

sexual harassment." *Id.* The victim did not complain to HR about the incident. Ms.

Lambert issued Mr. Morrison a "last and final warning," stating that "any further

performance issues within a 12-month period [] you will be subject to immediate

termination." App., Vol. II at 538.

Leprino argues that this incident was not sufficiently similar to Mr. Donez's

physical altercation because:

(1) the victim "did not complain at all,"

(2) the employee who reported the April 16 incident "believed it was horseplay,"

(3) Leprino disciplined Mr. Donez and Mr. Morrison under different policies, and

(4) different decisionmakers disciplined Mr. Donez and Mr. Morrison.

Aplee. Br. at 32-33. These arguments are not persuasive because:

(1) whether the victim complained does not affect the seriousness of the
    misconduct;

(2) the coworker who reported the incident testified that she believed Mr.
    Morrison engaged in "horseplay plus sexual harassment," and not just
    "horseplay." App., Vol. I at 105;

19

(3) if Mr. Donez and Mr. Morrison were disciplined under different policies, we should still ask whether the employees' underlying conduct was "of comparable seriousness," *PVNF*, 487 F.3d at 801; and

(4) Ms. Lambert and Ms. Soja were involved in disciplining Mr. Morrison and Mr. Donez.

Despite the foregoing, we conclude evidence of the April 2016 incident and Leprino's treatment of Mr. Morrison was insufficient to defeat summary judgment. Leprino's treatment of Mr. Morrison in April 2016 has limited probative value because it occurred after Mr. Donez's termination in February. As we have said, the "relevant inquiry for determining pretext is whether the employer's stated reasons were held in good faith *at the time of the discharge*, even if they later prove to be untrue." *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 947 (10th Cir. 2011) (emphasis added) (quotations omitted); *see also Heno v. Sprint/United Mgmt. Co*, 208 F.3d 847, 856 (10th Cir. 2000) ("Discriminatory incidents which occurred . . . anytime after [the contested action] are not sufficiently connected to the employment action in question to demonstrate pretext." (quotations omitted)). Further, Mr. Morrison and Mr. Donez engaged in different misconduct,[10] and an employer is "allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct." *Kendrick*, 220 F.3d at 1233. For these reasons, the Morrison evidence, especially when viewed with the other evidence in the record, could not lead a reasonable jury to find pretext.

---

[10] In contrast to the April 2016 Morrison incident, the altercation between Mr. Donez and Mr. Levar resulted in a hospitalization and a police investigation.

20

### iii. Ms. Campos

Mr. Donez contends he was similarly situated to Ms. Campos, an Hispanic woman fired by Leprino in June 2017 for kicking a co-worker. Mr. Donez suggests her termination demonstrates that Leprino disciplined Hispanic employees more severely than non-Hispanic employees who engaged in similar misconduct.

But any similarities between Ms. Campos's and Mr. Donez's incidents do not show that Leprino treated Hispanic employees less favorably than non-Hispanic employees. Mr. Donez needed to show that Ms. Campos was similarly situated to non-Hispanic employees who were treated more leniently. *See Hardy v. S.F. Phosphates Co.*, 185 F.3d 1076, 1082 n.4 (10th Cir. 1999) (suitable comparators cannot be members of plaintiff's protected class). He has not done so. And as with Mr. Morrison, because any alleged discrimination against Ms. Campos occurred after Leprino fired Mr. Donez, Leprino's treatment of her is not sufficient to show of pretext. *See Heno*, 208 F.3d at 856.

### b. *Other evidence*

Mr. Donez's remaining evidence is also unavailing. He relies on (1) emails from Ms. Soja to Ms. Lambert discussing the need to obtain the police report before firing Mr. Donez and (2) procedures Leprino used in conducting its investigation.

### i. Ms. Soja's emails

On February 22, 2016, Ms. Soja emailed Ms. Lambert to ask whether Leprino had received "the police reports, detective's statements on his conversation with [Mr. Donez], etc? We need those ASAP if we have not." App., Vol. II at 438. A few minutes later,

21

Ms. Soja followed up with another email to Ms. Lambert, explaining, "If we don't get that detective's statement on what Nic said to him, we probably can't term him." *Id.* at 437. Before the district court and on appeal, Mr. Donez has argued these emails demonstrate that Leprino used the police report to "rationalize its predetermined reason to fire [him]" after "Leprino's internal investigation did not justify terminating [him]." Dist. Ct. Doc. 46 at 2.[11] The record shows otherwise.

From the beginning of its investigation, Leprino knew Mr. Donez pushed Mr. Levar. On February 9, Mr. Donez told Detective Vosburg that he pushed Mr. Levar. The next day, Detective Vosburg relayed this information to Ms. Esterly-Wessbecker. Thus, as of February 10, Leprino knew Mr. Donez had pushed a co-worker. Ms. Soja's emails demonstrate that before firing Mr. Donez, Leprino wanted written confirmation that Mr. Donez pushed Mr. Levar, a fact it had known since the day after the altercation. The emails are not "evidence that [Leprino's] proffered reason for the employment decision was . . . unworthy of belief." *Kendrick*, 220 F.3d at 1230.[12]

In fact, the way Leprino HR personnel addressed the February incident confirms it fired Mr. Donez for participating in the altercation, not for an impermissible purpose.

_____

[11] We take judicial notice of arguments made in district court documents not included in the record compiled by the parties. *See St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979).

[12] Mr. Donez also argues it took longer to fire him than Mr. Levar because Leprino was fabricating a rationale to do so. This argument lacks merit. On the day of the altercation, Mr. Levar told Ms. Esterly-Wessbecker he punched Mr. Donez, an admission that provided grounds for his immediate termination. By contrast, Leprino waited to fire Mr. Donez until it had written confirmation of his role in the incident.

22

Leprino decided to fire Mr. Donez only after it knew that he pushed Mr. Levar.  Ms.

Soja's emails to Ms. Lambert showed diligence in securing written confirmation.  *See*

App., Vol. II at 437 ("If we don't get that detective's statement on what [Mr. Donez] said

to him, we probably can't term him.").

### ii.  Leprino's investigation procedures

Mr. Donez suggests that the way Leprino conducted its investigation, including its

reliance on the police report, is probative of pretext for three reasons.  All lack merit.

First, Mr. Donez contends Leprino's investigation into the altercation was

procedurally irregular, and thus probative of pretext, because Leprino "never" relied on

police reports when investigating other incidents of workplace misconduct.  Aplt. Br. at

28.[13]  We have explained that "disturbing procedural irregularities can satisfy the

requirements of a pretext claim."  *Fassbender*, 890 F.3d at 889 (quotations omitted).

"But the mere fact that an employer failed to follow its own internal procedures does not

necessarily suggest that the employer was motivated by illegal discriminatory intent or

that the substantive reasons given by the employer for its employment decision were

pretextual."  *Id.* (quotations and alterations omitted).  Thus, when determining whether

procedural irregularities are probative of pretext, we ask "whether the jury could

---

[13] This argument distorts Ms. Esterly-Wessbecker's deposition testimony.  Ms. Esterly-Wessbecker testified that during her time at Leprino, the police had only investigated one other episode of workplace misconduct, and she did not include the police report in the file for that incident.  App., Vol. I at 91.

conclude that the procedural irregularities were somehow related to the decision-maker's discriminatory purpose." *Id.* Here, the answer is no.

Mr. Donez has provided no evidence that police routinely investigate workplace misconduct incidents at Leprino. Nor is there evidence that Leprino had any practice or policy of *not* relying on police reports when investigating misconduct. But even if Leprino had such a practice, it was reasonable to rely on the police investigation in this case because it revealed that Mr. Donez admitted to pushing Mr. Levar, a crucial fact that Leprino's own investigation had not uncovered. Leprino's reliance on the evidence produced by an independent government entity, while perhaps not a common practice, was not "disturbing" in the slightest. *Id.* To hold otherwise would give rise to an inference of pretext whenever an employer departed from its standard procedures, even when it did so for legitimate reasons. Thus, even if Leprino's reliance on the police report were procedurally irregular, it does not suggest Leprino's rationale for firing Mr. Donez is unworthy of belief.

Second, Mr. Donez contends Leprino did not "attempt to interview [him] or request clarification" after receiving his written statement regarding the incident, which "was the typical practice when conducting investigations at Leprino." Aplt. Br. at 29; *see also* Dist. Ct. Doc. 102 at 15-16 ("Both the Employee Handbook and 'Workplace Security Policy' also state that in the event of an incident or complaint, Leprino is supposed to conduct an investigation and interview all witnesses."). This procedural departure, he argues, establishes pretext. We disagree.

24

For one thing, neither the Employee Handbook nor Workplace Security Policy mandate that HR personnel conduct interviews when investigating misconduct. The Employee Handbook says nothing about procedures for misconduct investigations. The Workplace Security Policy sets forth "guidelines for investigating an incident," which include questioning witnesses and the employee accused of violating the policy, but also notes that "[s]ome situations may not warrant as comprehensive of an approach as outlined" in the guidelines. App., Vol. I at 35. Because Mr. Donez has not identified a policy requiring Leprino to interview him, we cannot say that Leprino's failure to interview him establishes pretext. *See Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007) (failure to interview plaintiff before terminating her was not a disturbing procedural irregularity where there was no evidence the employer had a written policy requiring such an interview).

And even assuming Leprino had such a policy, we are not persuaded that Leprino departed from it here. Though Leprino may not have formally interviewed Mr. Donez, HR personnel spoke with him in the aftermath of the incident; solicited a written statement from him; relied on the FMPD's report, which incorporated information obtained through an interview with him; and called Mr. Donez to confirm details of the police report. Mr. Donez had several opportunities to tell his side of the story and there is no evidence Leprino was trying to avoid learning his version of events. Thus, any departure from the company's interviewing procedures was de minimus, not a disturbing procedural irregularity, and not indicative of pretext.

25

Third, Mr. Donez argues that Leprino's stated rationale for terminating his employment is not credible because the police report referred to Mr. Donez as the "victim," suggesting he was not a willing participant in the altercation. We addressed and rejected a similar argument in our discussion of his wrongful termination claim. Leprino fired Mr. Donez based on the undisputed evidence that he pushed Mr. Levar in a violent dispute. *See* App., Vol. III at 620. Thus, Mr. Donez's exact role in the fight—willing participant, victim, aggressor—had no bearing on Leprino's decision to fire him. Indeed, Ms. Esterly-Wessbecker told Mr. Donez that Leprino would have fired him even if it knew he had been acting in self-defense. The police report's reference to Mr. Donez as "the victim" does not cast doubt on Leprino's rationale for firing him.

\*  \*  \*  \*

Based on the summary judgment record, we conclude that Mr. Donez has not established that a reasonable jury could find "both that the reason [for his termination] was false, and that discrimination was the real reason," as required to establish pretext. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

### III. **CONCLUSION**

We affirm.

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge

26